556 F.2d 190
 95 L.R.R.M. (BNA) 2392, 81 Lab.Cas. P 13,224
 Charles NEDD, Dominic Iero, Max Dynoski and Anthony Ganly,
Members of the Pensioned Anthracite Coal Miners Protest
Executive Committee, suing on behalf of themselves and all
other members of the Class of Pensioned Anthracite Coal
Miners and Widows of Deceased Pensioned Anthracite Coal
Miners, Appellants,
and
Emmett Thomas, Mart F. Brennan, and John Jillson, Trustees
of the Anthracite Health and Welfare Fund
v.
UNITED MINE WORKERS OF AMERICA, an unincorporated Trade
Union Association, Emmett Thomas, Nicholas J. Haydock and
John D. Jillson, Trustees of the Anthracite Health and
Welfare Fund, Joseph Fauzio, Frank J. Galgay, (Added as
Trustees of Anthracite Health and Welfare Fund, per D.C.
order of 7/3/74).
 No. 76-1978.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 24, 1977.
Decided April 28, 1977.
 
 Thomas M. Kittredge, Philadelphia, Pa., James S. Palermo, Hazleton, Pa., John R. McConnell, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants.
 Thomas N. O'Neill, Jr., Carol A. Mager, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D. C., for United Mine Workers; Harrison Combs, United Mine Workers of America, Washington, D. C., of counsel.
 Before FORMAN, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This appeal concerns the right of pensioned coal miners to obtain relief for the failure of their pension fund trustees and their union to enforce anthracite coal mine operators' contractual obligations to pay a tonnage royalty to the Anthracite Health and Welfare Fund ("The Fund"). It has been litigated in the federal courts for fourteen years. There has been other, related litigation, seeking the same object: payment of earned sums for the benefit of the Fund's lawful cestuis.[1]
 
 
 2
 The Fund was created by the terms of the Anthracite Wage Agreement of 1946, when anthracite production was at its modern peak. Its purpose was to provide miners with retirement pensions. A sharp and prolonged decline in the anthracite mining industry, the result of competition from other energy sources, resulted in reduced income to the fund. In addition to the decline in production substantial delinquencies also accrued. By 1962, 120 mine operators owed almost $12 million to the Fund.
 
 
 3
 The gravaman of the pensioners' complaint, whether predicated on federal or on state law, is that the Trustees and the Union favored the interests of working miners over those of retirees and therefore failed to take prudent action to collect delinquencies from mine operators, who provided job opportunities. The district court rejected the contention that any harm resulted to the Fund from its relationship with the Union, and held that neither the Union nor the Trustees are liable to the Fund on account of the delinquencies.
 
 
 4
 On March 11, 1963 the pensioners filed a diversity action against the United Mine Workers, which was dismissed for lack of complete diversity.[2] Since under § 301(b) of the National Labor Relations Act, 29 U.S.C. § 185(b), the Union is suable as an entity, the pensioners filed a new complaint alleging a breach of contract. On an appeal certified to this court pursuant to 28 U.S.C. § 1292(b) we held that nothing in the labor agreement between the Union and the coal operators obligated the Union to enforce the operators' promise to pay royalties to the Fund. Thus we concluded that the complaint, as then drafted, did not state a claim upon which relief could be granted under § 301(a) of the National Labor Relations Act.[3] Although we did not agree that the complaint stated a cause of action for breach of a labor agreement, we recognized that the allegations of failure to enforce the operators' promise might state a claim for a breach of the Union's equitable duty as a fiduciary to act in the interest of the pensioners and its employed members without unreasonable discrimination. 400 F.2d at 105. We remanded with instructions to allow plaintiffs a reasonable time to amend their complaint to state such a claim, and to join the Fund Trustees as necessary parties. We recognized that the district court would have jurisdiction over such a claim under 28 U.S.C. § 1337.[4] Nedd v. United Mine Workers, supra, 400 F.2d at 106. On remand, an amended complaint joined the Fund Trustees as defendants, and alleged jurisdiction under 28 U.S.C. § 1337 and under 29 U.S.C. §§ 157, 158(b), 159(a), 185, 186, 301 et seq. and 501. The amended complaint alleged violations of federal law, but also included a pendent state law claim for breach of fiduciary duty. Plaintiffs demanded a jury trial. By an order dated June 30, 1970 the district court struck this demand. After protracted discovery, a non jury trial was held in June of 1974. The district court's opinion was filed on April 13, 1976.[5] It concludes:
 
 
 5
 (t)he following are this Court's holdings in this case:
 
 
 6
 1. This Court does not have subject-matter jurisdiction of plaintiffs' claims;
 
 
 7
 2. However, assuming that there is jurisdiction,
 
 
 8
 A. the statute of limitations was tolled by the trustees' actions and does not bar this suit;
 
 
 9
 B. the trustees are not liable either for violation of Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186, or for breach of the common law duty of undivided loyalty of a trustee;
 
 
 10
 C. although past trustees were guilty of a breach of a trustee's duty to enforce claims by virtue of their negligent handling of the problem of operator delinquencies, none of the trustees who are defendants in this case may be held liable for that breach;
 
 
 11
 D. the Union is not liable under any of the theories advanced by plaintiffs; and
 
 
 12
 E. if the Union is liable, it is entitled to have deducted from any recovery against it an amount equal to the total sum it has loaned the Fund since its inception.
 
 
 13
 In accordance with the above, judgment will be entered for the defendants.
 
 
 14
 Joint Appendix at 152a.
 
 
 15
 While at first blush it would seem that the district court should have stopped after concluding it lacked subject matter jurisdiction, the actual holding appears to be a rejection of the federal claims as a matter of law after a full trial, and a rejection of the pendent state law claim on the merits as well. On appeal the pensioner plaintiffs advance several contentions. They contend that the court erred in rejecting all federal claims; that their federal claims were sufficiently substantial to support pendent jurisdiction over their state law claims; that the court erred in striking their demand for a jury trial; and that it erred in entering judgment for the defendants. The defendant Union and the defendant Fund Trustees urge that the federal claims are so insubstantial that the district court was correct in holding that it lacked subject matter jurisdiction, but that its findings that there were no breaches of fiduciary duties are not clearly erroneous and should be affirmed if there was jurisdiction.
 
 I. FEDERAL QUESTION JURISDICTION
 
 16
 The amended complaint alleges three federal law theories: (1) failure to enforce a collective bargaining contract, a federal common law action implied from the jurisdictional grant over such claims in § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a); (2) breach of the federal common law duty of fair representation; and (3) breach of fiduciary duties implied from the prohibitions of § 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186. The district court, after an extended analysis, concluded that none of these theories would support federal jurisdiction and that since there was no federal question jurisdiction, it could not exercise pendent jurisdiction.[6] We conclude that in the circumstances of this case federal law causes of action of sufficient substance to support federal question jurisdiction were pleaded. Moreover, we conclude that the court could properly, as ultimately it did, try the pendent state law cause of action.
 
 A. The § 301 Contract Claim
 
 17
 The § 301 claim against the Union must be considered separately from that against the Trustees. Although our prior decision in Nedd v. United Mine Workers, supra discussed a § 301 claim against the Union, that opinion did not reach the issues presently before us.[7]
 
 
 18
 The § 301 claim against the Trustees is based on a provision in the 1952 interim Agreement between the Union and the operators:The Trustees of the Fund shall use due diligence and all reasonable means to collect and prevent delinquent obligations to the Fund.
 
 
 19
 Plaintiffs' exhibits, Vol. A, p. 67. This provision was incorporated by reference in all subsequent Anthracite Wage Agreements. The district court points out that the trustees were not parties to the contract, and therefore undertook no duties under it. It urges, moreover, that the clause is merely a statement of the trustees' fiduciary duties, and does not render those duties contractual in nature. Granted these premises, the conclusion which the district court drew, that it lacked § 301 jurisdiction, does not follow.
 
 
 20
 The above quoted clause is a contractual recognition that the trustees have standing to sue to enforce the royalty provisions.[8] It is settled law that a suit by non-party trustees to enforce those provisions may be entertained in federal district court by virtue of § 301.[9] It is also settled law that employees, although not formally parties to a collective bargaining agreement, can bring a § 301 suit to enforce its terms. Smith v. Evening News Ass'n., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Where the trustee may sue and wrongfully fails to do so, the beneficiary may sue the trustee as well as the party or parties the trustee failed to sue.[10] Thus, the complaint states a non-frivolous cause of action under 29 U.S.C. § 301, which provides for suits in federal court for violation of such contracts.
 
 
 21
 In Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 398 n.20, 30 L.Ed.2d 341 (1971), while holding that an employer had no statutory duty to bargain collectively with a union representing its employees over benefits for retirees, the Court observed:
 
 
 22
 (t)his does not mean that when a union bargains for retirees which nothing in this opinion precludes if the employer agrees the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col.L.Rev. 909, 916-20 (1970). The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. See Smith v. Evening News Assn., 371 U.S. 195, 200-201, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Lewis v. Benedict Coal Corp., 361 U.S. 459, 470, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960).
 
 
 23
 The federal common law of collective bargaining agreements, which grows out of 29 U.S.C. § 185(a), would permit pension trust fund beneficiaries to sue, derivatively, to enforce the mine operators' payment obligations when the trustees did not. It is but a small step further to suggest that the same federal common law of collective bargaining agreements permits a suit against the Fund Trustees, and the Union which allegedly acted in concert with them for the destruction of the value of the bargained-for and vested contract rights.[11]
 
 
 24
 The district court held that the entire matter was referable to the state law of trusts. We think, however, that the same policy considerations which favored recognizing a uniform federal law of collective bargaining agreements apply with equal force to support the application of federal common law to the instant claim against § 302 pension fund trustees.[12] The Anthracite Wage Agreement was a national contract. The royalty obligations, which are the sole source of Fund corpus, are entirely a creature of the federal law of labor contracts. It would advance no sound public policy to hold that liability for the destruction of those obligations by purposeful or careless nonenforcement should vary from state to state, depending upon the vagaries of the state law of trusts. We therefore disagree with the district court's conclusion that jurisdiction under § 301 was lacking.[13]
 
 
 25
 Since the district court did not consider § 301 as we have done, it had no occasion to decide whether a federal court would apply Pennsylvania legal precepts to the § 301 claim against the trustees or fashion its own rule. We will address that question later in our discussion of the merits of the claim. For our immediate purpose we merely note that judged by the standards for determining whether a federal jurisdictional allegation supports pendent jurisdiction, the § 301 claim against the trustees was sufficient.[14] The contention that there is a § 301 federal common law cause of action for the destruction of a collectively bargained-for contract obligation is not foreclosed by prior case law and is not frivolous. Cf. Crawford v. Cianciulli, 357 F.Supp. 357, 367 (E.D. Pa. 1973).
 
 B. Duty of Fair Representation
 
 26
 The district court has jurisdiction under §§ 1331 and 1337 over a claimed breach of the duty of fair representation.[15] In Nedd v. United Mine Workers of America, supra, 400 F.2d at 105, this Court noted that the conduct attributed to the union
 
 
 27
 (m)ay well constitute a breach of the union's equitable duty as a fiduciary representative of employees to act in their interest, fairly and in good faith, and without discrimination throughout the area in which it has been impowered to function.
 
 
 28
 Since we remanded for the purpose of considering the claim that the Union may have breached its duty of fair representation, it would be difficult to say that such a federal claim was so patently groundless that it would not support pendent jurisdiction, unless developments subsequent to our last opinion rendered it so.
 
 
 29
 The subsequent development relied on by the district court is the Supreme Court's decision in Chemical Workers v. Pittsburgh Plate Glass, supra. In that case the Court held: (1) that retirees were not members of a collective bargaining unit, and that their benefits were not a mandatory subject of collective bargaining within the meaning of § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d); and (2) that an employer did not commit an unfair labor practice by making a unilateral change in retiree benefits. As the Court wrote:
 
 
 30
 "(t)he remedy for a unilateral mid-term modification to a permissive term lies in an action for breach of contract, see n. 20, supra, not in an unfair-labor-practice proceeding." 404 U.S. at 188, 92 S.Ct. at 402.
 
 
 31
 Chemical Workers v. Pittsburgh Plate Glass, supra, does not deal explicitly with the question for the decision of which we remanded when this case was before us in 1968.
 
 
 32
 The district court concluded that Chemical Workers implicitly controlled, by holding that retirees were not members of the bargaining unit for purposes of mandatory collective bargaining. The duty of fair representation, it held, extends only to members of the bargaining unit. But in Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952) the Court held that the duty of fair representation prevented a union from discriminating on the basis of race in the collective bargaining process against employees who were not members of the bargaining unit the union represented. See generally Goetz, Developing Federal Labor Law oF welfare anD pensioN plans, 55 cornelL L.rev. 911, 913-14 (1970). in Chemical Workers v. Pittsburgh Plate Glass, supra, 404 U.S. at 181, n. 20, 92 S.Ct. at 398, Justice Brennan said:
 
 
 33
 "(n)othing in Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), is to the contrary. In Howard we held that a union may not use the powers accorded it under law for the purposes of racial discrimination even against workers who are not members of the bargaining unit represented by the union. The reach and rationale of Howard are a matter of some conjecture. See Cox, The Duty of Fair Representation, 2 Vill.L.Rev. 151, 157-159 (1957). But whatever its theory, the case obviously does not require a union affirmatively to represent nonbargaining unit members or to take into account their interests in making bona fide economic decisions in behalf of those whom it does represent."
 
 
 34
 This footnote reference plainly preserves Howard. While Chemical Workers v. Pittsburgh Glass held that future retiree benefits were not the subject of mandatory collective bargaining, it also recognized that such benefits were a permissive subject of bargaining. When the Union elects to undertake such bargaining, the union's duty of fair representation must apply. It is hardly conceivable that a union could discriminate among retirees on the basis of race, religion, or sex, for example. Moreover, Chemical Workers, supra, deals with bargaining over future retiree benefits. It does not deal with the Union's duty when it unilaterally undertakes, as the Mineworkers' Union undertook, to act as collector and enforcer of the Fund's contractual royalty entitlement. The Union need not have done so, and if it had not, the pensioners would have had a remedy against the employers for any delinquencies. Chemical Workers, supra, 404 U.S. at 181 n. 20, 92 S.Ct. 383. But having undertaken, on behalf of the Fund, to enforce the employers' obligation to pay royalties, the Union was not then entitled to act in a manner which discriminated against the pensioners.
 
 
 35
 The district court reasoned that ". . . federal labor policy does not necessarily require that a union which acts as the exclusive bargaining agent for retirees be held to the statutory duty of fair representation." Joint Appendix at 80a. Federal labor policy does not "necessarily" require the recognition of a duty of fair representation at all. But federal common law implied from the statutory authority conferred upon collective bargaining representatives has recognized the need to place limitations upon the power of the recognized bargaining representative to injure minorities inside and outside the bargaining unit. We do not read Chemical Workers v. Pittsburgh Plate Glass, supra, as overruling what this court said in Nedd v. United Mine Workers, supra. The allegation, that the Union's actual and voluntary participation in non-enforcement of the obligation to pay royalties violated a federal law duty of fair representation, states a not insubstantial claim over which the court had § 1331 and § 1337 jurisdiction. That sufficed for purposes of pendent jurisdiction over the state law issues. As with the § 301 claim, we defer to our discussion of the merits the substance of the federal law cause of action.
 
 
 36
 C. The § 302 Claim of Breach of Fiduciary Duty
 
 
 37
 The Labor Management Relations Act of 1947 was inspired in part by the very Fund in issue in this case. Section 302 of the Act contains a broad prohibition against payments from employers to representatives of employees.[16] Because this broad prohibition would prevent payments to a union pension or welfare fund, § 302(c)(5) contains an exception for such funds. That subsection also provides, however, that employees and employers be equally represented in their administration.[17] The pensioners contend that for many years during which the mine operator delinquencies were permitted to accumulate there was what is commonly referred to as a "structural" violation of § 302(c)(5), in that the union-designated trustees were a majority. The pensioners urge that this "structural" violation gives rise to a federal common law cause of action[18] for breaches of fiduciary duties which were made possible by the fact of union domination. The § 302(c)(5) claim was added by amendment following our remand in Nedd v. United Mine Workers, supra. By that time the structural violation of § 302(c)(5) had been corrected, but the court permitted the amendment. The defendants do not dispute that this was an amendment which, under Fed.R.Civ.P. 15(c), could properly relate back to the filing of the § 301 complaint in 1965. Nor could they, since the predicate for the pensioners' claims is common to the several theories advanced in support of federal question jurisdiction, including the § 302(c)(5) theory. See 3 J. Moore, Federal Practice P 15.15(3), pp. 1027-1031 (1974). Rather, they contend that a Rule 12(b)(6) motion on the § 302(c)(5) claim for money damages should so clearly have been granted that the assertion of such a claim is insufficient to support pendent jurisdiction. The district court agreed. We do not.
 
 
 38
 Many courts which have considered whether there can be a federal cause of action for money damages growing out of a structural violation of § 302 have taken as their point of departure the language of § 302(e):[19]
 
 
 39
 "(t)he district courts of the United States . . . shall have jurisdiction for cause shown . . . to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of sections 101-115 of this title."
 
 
 40
 Courts have differed on the question whether this section confers jurisdiction over all cases concerning § 302 pension plans, or limits jurisdiction to suits for injunctive relief against structural deficiencies which violate the "sole and exclusive benefit" provisions of § 302(c)(5).[20]
 
 
 41
 We are not convinced, however, that § 302(e) is, for jurisdictional purposes, the appropriate starting point. The subsection uses the language "shall have jurisdiction," but the usage must be read in conjunction with the cross references to the anti-injunction provisions of the Clayton Act[21] and the Norris-LaGuardia Act.[22] The latter, in particular, is couched in terms of a lack of jurisdiction to issue an injunction. 29 U.S.C. § 101. It seems likely that no more was intended by § 302(e) than to remove, in the context of enforcement of § 302, the bar of the anti-injunction statutes to which reference was made.[23] That, certainly, was the explanation of Senator Ball, who introduced § 302 as an amendment during the consideration of the Labor Management Relations Act.[24]
 
 
 42
 If one looks upon § 302(e) as the removal of a bar to injunctive relief, rather than as an affirmative grant of jurisdiction, then two things become plain. The first is that civil suits in federal courts were contemplated by § 302, and that some federal law would have to govern such suits in order to meet Article III jurisdictional requirements. The second is that jurisdiction was assumed to exist, rather than granted.
 
 
 43
 The problem, then, is not unlike that considered in Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), in which the Court undertook to determine what Congress meant by the language in § 301
 
 
 44
 "(S)uits for violation of contracts . . . may be brought in any district court of the United States having jurisdiction of the parties, . . . without regard to the citizenship of the parties."
 
 
 45
 The Court found in that provision authority to fashion federal common law. 353 U.S. at 456, 77 S.Ct. 912. As to jurisdiction, however:
 
 
 46
 "Title 28 U.S.C. § 1337 says that 'The district courts shall have original jurisdiction of any civil action or proceeding arising under any act of Congress regulating commerce . . . .' It is that original jurisdiction that a § 301 action invokes." Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 561-62, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968).
 
 
 47
 It is the jurisdiction conferred in §§ 1331 and 1337 that is invoked by the allegation of a federal common law cause of action implied from the provisions of § 302(c)(5).[25]
 
 
 48
 In determining whether such a cause of action may be implied, and for what purposes, we must look for guidance to such recent Supreme Court pronouncements as Santa Fe Industries v. Green, --- U.S. ----, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) and National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). In Cort v. Ash, supra, Justice Brennan summarized:
 
 
 49
 "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U.S. at 78, 95 S.Ct. at 2087 (emphasis in original).
 
 
 50
 Appellants argue that the Fund's monetary loss was due to Union domination, in violation of § 302(c)(5), and claim entitlement to a money judgment by virtue of that section. Applying the four-pronged test of Cort v. Ash, we think their complaint states a cause of action properly implied from § 302. First, the fund beneficiaries are the class for whose especial benefit § 302(c)(5) was enacted.[26] Second, there is a clear indication in § 302(e) that civil remedies for enforcement would be recognized.[27] Since some federal civil actions would be recognized, Congress obviously assumed that the federal courts would fashion both remedial and substantive rules of law for their disposition. Nothing in either the text of § 302 or in its legislative history suggests any hostility to damage remedies. Third, the recognition of private enforcement is entirely consistent with the underlying legislative scheme. In contrast with the statute considered in Cort v. Ash, supra, we are dealing with more than a bare criminal statute.[28] In contrast with that considered in National Railroad Passenger Corp. v. National Association of Railroad Passengers, supra, we are not dealing with a statute naming specific prospective plaintiffs. In contrast with Securities Investor Protection Corp. v. Barbour, supra, recognition of an implied private action for recovery of money can in no way conflict with enforcement efforts intrusted to a public agency. Recognition of a derivative cause of action for the recovery of money for the trust is consistent with the overall statutory purpose of § 302(c)(5) the preservation of the trust corpus for its intended beneficiaries. Fourth, while the duties of fiduciaries has traditionally been a matter of concern of the States, collective bargaining agreements, at least in the private sector,[29] have since 1947 been of federal concern. While the Fund is nominally a trust created under state law, it is a unique kind of trust, the corpus of which is the fruit of collective bargaining agreements.[30] The very enactment of § 302(c)(5) shows that Congress was not satisfied to leave protection of these bargained-for benefits entirely to the state law of trusts.
 
 
 51
 That does not necessarily mean that Congress has preempted all state law with respect to the fiduciary obligations of welfare fund trustees. Such a construction of the statute is possible. Cf. Teamsters Local v. Lucas Flour, 369 U.S. 95, 102-04, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Another construction might result in the establishment of federal minimums for fiduciary conduct with state law remaining operative when it imposed higher obligations.[31] Most of the federal courts which have considered the availability of private federal law causes of action implied from § 302(c)(5) have suggested a fairly narrow area in which such law might operate.[32] They have drawn the line between actions involving structural deficiencies in the fund administration or provisions, and ordinary breaches of fiduciary duties by trustees of a Fund conforming with § 302(c)(5). Since this case involves a structural deficiency claim, we need only consider whether federal law provides a derivative damage remedy for that claim against the Trustees, the Union, or both. We agree with the courts which have held that a pleading which alleges such a claim is sufficiently non-frivolous to vest federal question jurisdiction. Moreover, we hold that such a claim could not be dismissed on a Rule 12(b)(6) motion, that it was not appropriate, on this record, for summary judgment, and that it was properly disposed of only after a hearing.
 
 
 52
 Although the district court concluded that it lacked subject matter jurisdiction, it did so only after the case was fully litigated. Since we have held that non-frivolous federal causes of action were pleaded which support jurisdiction under 28 U.S.C. §§ 1331 and 1337, the court properly tried the pendent state law claims as well. We therefore proceed to the merits of the appeal.
 
 III. THE JURY TRIAL CONTENTION
 
 53
 The pensioners' complaint made a timely demand for a jury trial. The defendants moved pursuant to Fed.R.Civ.P. 39(a)(2) to strike that demand, contending that the action, whether based on federal or state law, was essentially an equitable one, unknown at common law. The district court granted the defendants' motion, and the case was tried by the court sitting without a jury. The pensioners contend this was error. They urge that the suit is essentially one for the recovery of money, and that such a suit, regardless of the source of the law which creates the cause of action, is an action at law within the meaning of the seventh amendment. That is true of suits in which the plaintiff seeks the recovery of money for himself.[33] Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). But in this case what is sought, whether the source of the action is federal law or state law, is recovery not for the plaintiffs, but derivatively, for the Fund. Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), held that a corporate shareholder's derivative action was entitled to a jury trial when, if the same action had been brought to the corporation on whose behalf recovery is sought, it would have been denominated "legal," rather than "equitable." A trust, however, is not a corporation.
 
 
 54
 The district court held, and we agree, that the suit against the Trustees under Pennsylvania law was essentially a suit for an accounting of their stewardship, and thus essentially equitable. See III Scott on Trusts § 197.1, p. 1627 (3d ed. 1967); American Law Institute, Restatement of Trusts (Second), § 197 and Comment b (1959). The federal law claims against the Trustees are similar in nature. Regardless of their statutory source, the relief sought by the beneficiaries is to have the Trustees account to the Fund for their breach of duty in neglecting to enforce claims belonging to it.
 
 
 55
 The various claims against the Unions are also essentially equitable. Regardless of the source of the cause of action, the suit is by trust beneficiaries and seeks recovery for the trust.
 
 
 56
 "The beneficiaries of a trust cannot maintain an action at law against a third person who commits a tort or other wrong with respect to the trust property, although a beneficiary in possession of the subject matter of the trust can maintain such actions at law as are permissible to one in possession. The interest of the beneficiary is an equitable interest and ordinarily is protected by suits in equity rather than by actions at law. We have seen that the ordinary remedy of the beneficiary against the trustee is in equity, and that the beneficiary can maintain an action at law against the trustee only where the trust is essentially a passive trust. So also, insofar as the beneficiary is entitled to maintain an action against a third person acting adversely to the trustee, his remedy is in equity." IV Scott on Trusts § 281, p. 2332 (3d ed. 1967) (Citations omitted).
 
 
 57
 See Langdon v. Sherwood, 124 U.S. 74, 8 S.Ct. 429, 31 L.Ed. 344 (1888); Lessee of Smith v. McCann, 65 U.S. (24 How.) 398, 16 L.Ed. 714 (1860); Fenn v. Holme, 62 U.S. (21 How.) 481, 16 L.Ed. 198 (1858). Neither Curtis v. Loether, supra, nor Ross v. Bernhard, supra, cast any doubt upon the continued authority of the rule that the remedies of trust beneficiaries, against trustees or third parties, are equitable rather than legal. That the liability of either or both may be a matter of federal rather than state law has no bearing on the seventh amendment issue. The district court properly held that the pensioners were not entitled to a jury trial.
 
 IV. THE MERITS
 
 58
 In discussing the merits of this case the district court considered the defendants' liability on all the legal theories asserted by plaintiffs except that based on § 301. As to that claim it relied on its jurisdictional determination, with which we disagree. However, any § 301 cause of action for the destruction of the value of the contractual right to royalties would, in the instant case, require no different factual findings than those required for the fair representation or § 302 claims. We therefore treat the district court's discussion as if it disposed of all claims under federal and state law.
 
 
 59
 The district court found that in the years 1948 through 1967 two of the three trustees of the Fund were Union members and officers. Section 302(c)(5)(B) of the Taft-Hartley Act, 28 U.S.C. § 186(c)(5)(B) requires that for a Fund to be a lawful recipient of monies paid by, e. g., an employer, that Fund must meet certain requirements. Among them is the requirement that
 
 
 60
 "employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . . ."
 
 
 61
 Since the trustees were dominated by Union representatives, the district court correctly concluded that during all those years the Fund was in violation of § 302(c)(5). It also found that by December 1, 1954, the first year for which figures are available, 46 companies were delinquent in an amount of almost $2,500,000. By 1962 the delinquency of 120 companies totalled $12,000,000. It is the bulk of these delinquencies which remains uncollected. The trustees filed some 30 lawsuits against 26 delinquent operators during the period 1954-1962, but the district court found:
 
 
 62
 "On the whole, these suits were not pursued vigorously and were largely ineffectual in collecting over-due amounts." Joint Appendix at 45a.
 
 
 63
 Trustee activity increased after 1962. The Court found:
 
 
 64
 "A substantial contributing factor in the increase in trustee activity during this time was the formation of the Panther Valley Protest Committee in June, 1961, and the retention of Counsel by the Committee in August, 1962."
 
 
 65
 The Fund retained Charles A. Shea as special counsel in January 1962. He noted that the Fund was in violation of § 302(c)(5), and advised that the structural defects be corrected. One defect existed because Trustee Brennan, designated as a "neutral" trustee, was actually a union officer. The Court found:
 
 
 66
 "Brennan, however, refused to resign as trustee until February, 1967. The Agreement itself was not amended to insure conformity with Section 302 until 1966." Joint Appendix at 47a.
 
 
 67
 The Court also found that in January 1954 the trustees, in announcing to the pensioners a reduction in pension payments, misrepresented to them that the Fund predicament was attributable solely to a decline in coal production, while failing to disclose the extent of mine operator delinquencies. Joint Appendix at 89a. A similar misrepresentation and nondisclosure occurred when pensions were again reduced in June, 1958. Joint Appendix at 90a. When the existence of delinquencies became public knowledge, the Court found, a Trustee issued public statements which misrepresented both the seriousness of the problem and the extent of the trustees' efforts to keep payments current:
 
 
 68
 "Particularly because the trustees were fiduciaries in whom the pensioners were expected to and did repose their trust and confidence, and the pensioners had been given no cause to suspect the trustees' representation of the Fund's financial situation, the inevitable effect of the statements of the 1950's was to prevent the pensioners from making any inquiries on their own into the Fund's financial condition." Joint Appendix at 91a-92a.
 
 
 69
 The Court also found "that the union did not join with the trustees in preventing the pensioners from learning the facts about operator delinquencies sooner than December, 1961." Joint Appendix at 92a. It declined to attribute to the unions the actions of union officers Brennan and Kennedy who were trustees. But it also found:
 
 
 70
 "The record reveals little direct activity by the trustees with respect to delinquencies during the years 1962 and 1963. This was probably because most of the activity (with respect to delinquencies) on behalf of the Fund during those years was conducted by the Union." Joint Appendix at 48a.
 
 
 71
 "As mentioned, supra, the Union has been intimately involved with the affairs of the Fund since its inception in 1946." Joint Appendix at 51a.
 
 
 72
 "Furthermore, a close relationship between the Union and the Fund was perhaps inevitable because of the manner in which the Fund has been organized. At most times relevant to this suit, two of the Fund's three trustees were Union officers.[11]
 
 
 73
 11. At the time of his appointment as a trustee, Thomas Kennedy was Secretary-Treasurer of the Union. He continued to serve as a trustee of the Fund until his death in 1963, at which time he was President of the Union. John O'Leary was Vice President of the Union at the time he was made a trustee, and Mart F. Brennan was President of District 7, UMW at the time of his appointment. In addition Brennan later became a member of the International Executive Board of the Union, and served in that capacity during almost 10 of the years he was a trustee. During his years as a trustee, Emmitt Thomas was Special Representative for Anthracite Affairs for the International Union, UMW, and from 1948 through 1962, he was Executive Assistant to the President of the Union. He also was a member of the International Executive Board of the Union during some of the years that he was a trustee. Nicholas Haydock was not a Union official and had no prior association with the industry.
 
 
 74
 Joint Appendix at 52a.
 
 
 75
 " . . . (t)here is no instance reflected in the record of this case of the two Union trustees casting disparate votes during their management of the fund, and the record refers to at least one occasion on which the two Union trustees expressed concern about whether actions taken on behalf of the Fund could be taken by two of the three trustees in order to avoid having the Fund, in effect, ruled by the Operator trustee.
 
 
 76
 The most significant Union involvement in the affairs of the Fund, aside from participation of Union officials as trustees, has been its attempts to enforce the operators' duty to make royalty payments and its efforts to collect delinquencies."
 
 
 77
 "In view of the numerous instances of Union attempts to collect delinquencies reflected in the record, as well as the scant evidence of direct communication between the trustees and the operators concerning delinquencies, it is fair to conclude that the trustees looked to the Union to furnish most of the effort with respect to enforcement of the operators' agreement to contribute to the Fund and collection of delinquencies, and that the Union unhesitatingly accepted this responsibility." Joint Appendix at 53a-54a (footnote omitted).
 
 
 78
 "Besides the above-described instances of significant Union involvement with the Fund, there have been numerous occasions of less significant Union participation in the Fund's affairs. One of these was the transfer of $205,000 of the Fund's monies to the National Bank of Washington, D.C., a union controlled bank, in December of 1962." Joint Appendix at 57a.
 
 
 79
 "Another instance of Union involvement in the Fund's affairs was the transfer, in May of 1963, of the Fund's offices from the Markle Banking and Trust Company Building in Hazleton, Pennsylvania, to the United Mine Workers Building in the same city.
 
 
 80
 "On seven occasions, the trustees held their regularly scheduled Fund meetings in the UMW offices in Washington, D.C. rather than at the Fund headquarters. To be eligible to receive a pension from the Fund, a retired miner had to remain a member in good standing of the Union during the period he received a pension, which included paying dues of $1 per month to the Union." Joint Appendix at 58a-59a.
 
 
 81
 The foregoing findings of fact, which are amply supported by the evidence, establish beyond dispute that the Union by virtue of the § 302(c)(5) equal representation violation, placed itself in the position of the Trustees for all practical purposes with respect to the enforcement of the royalty obligations of the mine operators. Whether one looks to the Pennsylvania law of trusts or to an appropriate federal standard created under any of the three federal legal theories asserted by the plaintiffs the Union must, in the circumstances of this case, be held to the same standard of conduct in discharging its assumed obligations toward the Fund as that of the Fund's nominal Trustees. The Union argues that the concept of "de facto" trustee is one unknown to Pennsylvania law. But we decline to turn the result on labels. The concept of liability for knowing participation in a breach of trust is well recognized.[34]Moreover, the district court found that the Union undertook the task that the trustees should have been performing. Clearly it had full knowledge of their inactivity since at all times two of the three trustees were its high officers. Because it never freed the Fund from its domination, despite the clear command of § 302(c)(5), it was in the position of controlling the extent of the Fund's efforts to collect the royalty payments. In that position, as the district court found, it undertook the task. It cannot now say that its efforts should be measured by less than a fiduciary standard. And in examining the evidence of those efforts we may not lose sight of the fact that the Union, by continuing to dominate the Fund in violation of § 302(c)(5), placed itself in a position of inherent conflict between its fiduciary obligation to the Fund beneficiaries and its duties toward the working miners whose jobs might be imperiled by vigorous enforcement.
 
 
 82
 The pensioners point out that the Trustees persisted in a policy of inadequate enforcement. In particular, they failed to vigorously prosecute lawsuits against delinquent operators, all to the benefit of working Union members. They also point to record evidence indicating that the trustees were less active in pursuing the delinquencies of some operators than of others. As to the first contention, the District Court, acknowledging that public statements by the trustees established their interest in keeping working mines open, concluded:
 
 
 83
 " . . . the statements themselves do not support plaintiffs' position that the policy of avoiding the closing down of delinquent operators for the purpose of promoting the Union's interest in not harming working miners." Joint Appendix at 104a (emphasis supplied).
 
 
 84
 As to selective non-enforcement, the district court, acknowledging that failure to pursue three major producers evidenced a lack of due diligence, reasoned:
 
 
 85
 " . . . no explanation for this apparently disparate treatment is suggested by the evidence in this case. For example, there is no evidence of any arrangements, sweetheart deals or kickbacks between the trustees and any operators. There is not even an indication that the trustees deliberately decided to treat some operators differently than others. In the absence of any such evidence, I am unwilling to find that the discrepancies in the trustees' treatment of delinquent operators were either intentional, motivated by some improper purpose, or beneficial to the Union. Id. at 104a-105a (emphasis supplied).
 
 
 86
 The italicized portions of the two quotations disclose the critical error in the district court's approach to the case. The pensioners established that the Union Trustees, in illegal domination of the Fund, were in a position of conflicting loyalties, and that in that position they pursued a policy which prima facie benefitted one group to the detriment of another.[35] At that point the burden of explanation or justification should properly have shifted to the fiduciaries.[36] Instead the court charged the pensioners with the failure to prove an evil intention.
 
 
 87
 The District Court justified its approach of requiring the pensioners to prove evil motive by relying on the Pennsylvania rule that those who seek to surcharge a fiduciary for a breach of trust must bear the burden of proving the particulars of his wrongful conduct. Entirely apart from the question whether that is the appropriate standard to apply to fiduciaries in control of a union pension fund in violation of federal law, we think the Pennsylvania authorities relied on do not support the court's result. In re Flagg's Estate, 365 Pa. 82, 88-89, 73 A.2d 411, 416 (1950) holds no more than that a testator can appoint a trustee of a testamentary trust who by virtue of another position may have divided loyalties. It merely reversed a ruling of automatic disqualification. Landis Trust, 382 Pa. 486, 115 A.2d 167 (1955) indicates that the beneficiaries may consent to a trustee, who is also a creditor of some beneficiaries, making loans on collateral from the trust. It holds that if they consent, they must show that the trustee acted with respect to the collateral in bad faith, if they are to surcharge the trustee. The more appropriate authority is Estate of Stetson, supra n.36, 345 A.2d 679 at 690 (1975):
 
 
 88
 In general, one who seeks to surcharge a trustee bears the burden of proving that the trustee breached an applicable fiduciary duty. Killey Trust, 457 Pa. 474, 478, 326 A.2d 372, 375 (1974); Linn Estate, 435 Pa. 598, 607, 258 A.2d 645, 650 (1969). However, when a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, we believe that the burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty. Accord, Branch v. White, 99 N.J.Super. 295, 313, 239 A.2d 665, 674, cert. denied, 51 N.J. 464, 242 A.2d 13 (1968);[15] cf. Restatement (Second) of Trusts § 212(4) (1959). We believe that, as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty.
 
 
 89
 15. "(T)he burden of proof should be on the defaulting trustee clearly to disestablish causal connection between default and loss to the beneficiary, rather than the contrary.
 
 
 90
 This is an appropriate federal rule of fiduciary obligation as well. The district court, having found that the Union was in an illegal conflict of interest position in its domination of the trust, nevertheless placed the burden of proof on the pensioner beneficiaries, and ruled:
 
 
 91
 " . . . I conclude that the plaintiffs have not met their burden of establishing that the trustees breached their § 302 and common law duties of individual loyalty by purposefully failing to collect delinquent operator royalties in order to benefit the union." Joint Appendix at 111a.
 
 
 92
 Placing the burden on the pensioners instead of on the Union and trustees who were in a position of divided loyalty and domination due to their violation of § 302(c)(5) was legal error which requires a reversal.[37] But in addition, the court expressly found that
 
 
 93
 " . . . the trustees failed to pursue the delinquencies, even within the framework which they adopted, with sufficient diligence to achieve that degree of common skill, common prudence and common caution which reasonable men would be expected to exercise with respect to their own property. Moreover, I find that under the circumstances it was unreasonable for the trustees to persist in their tolerant approach for as long as they did." Joint Appendix at 126a.
 
 
 94
 Appellees challenge this finding, but it is supported by detailed findings of fact amply supported by the evidence. This finding of trustee negligence applies to the period prior to 1964. Joint Appendix at 133a. The trustees who served during that period are deceased and their estates have not been joined as parties. One trustee defendant, Thomas, began his tenure in 1963, but the court found that he had not been personally guilty of negligence. The district court concluded:
 
 
 95
 "(t)hus, although it is the finding of this Court that past trustees violated their fiduciary duty to the Fund's beneficiaries to make reasonable efforts to enforce the operators' obligations to the Fund, none of the trustee defendants in this lawsuit may be held liable for the violation by their predecessors." Joint Appendix at 134a.
 
 
 96
 We cannot quarrel with that conclusion.
 
 
 97
 We do, however, differ with the conclusion that the breach of fiduciary duties which occurred during the time when the enormous losses occurred should not be attributable to the Union, which throughout that period was in actual control of the collection efforts as a result of the § 302(c)(5) equal representation violation. That conclusion is set out as follows:
 
 
 98
 "The argument that the Union caused the trustees to fail to collect royalty payments in order to protect working miners is a corollary to the contention that the trustees purposefully failed to collect royalties in order to benefit the Union. As has already been discussed, supra, the record in this case does not disclose that the trustees purposefully failed to collect royalties, nor does it support the conclusion that they failed to collect royalties in order to benefit the Union by protecting the interests of working miners. It establishes no more than the trustees were negligent in not pursuing their collection policies more diligently and in persisting in their tolerant approach to the problem for as long as they did. Thus, the short answer to plaintiffs' argument concerning the Union's participation in the trustees' purposeful breach of their fiduciary duties is that because the underlying theorem is not true, the corollary is also untrue, that is, the Union could not have caused the trustees to fail to collect royalties in order to protect working miners because the record does not establish that the trustees acted unlawfully in order to protect working miners." Joint Appendix at 136a-137a.
 
 
 99
 This reasoning suffers from the same defect we noted above with respect to the burden of proof. But more fundamentally, it is inconsistent with the court's finding that the trustees delegated to the Union the collection responsibility and that the Union willingly undertook it. Since the Union undertook the task and controlled the fiduciaries, it became a fiduciary, and its duty toward the fund beneficiaries should have been measured by the same standard of care as the court applied to the trustees.
 
 
 100
 In rejecting this contention the district court distinguished Blankenship v. Boyle, 329 F.Supp. 1089 (D.D.C.1971) which held the Union liable when union trustees, dominating the Fund in violation of § 302(c)(5), allowed large sums of the bituminous coal industry fund to remain in interest-free accounts at a union-owned and controlled bank. The district court reasoned that while the relationship between the Union and the fund in that case and this were the same,
 
 
 101
 "(t)he trustees in Blankenship were guilty of a breach of their duty of loyalty; the trustees here are not."
 
 
 102
 That distinction will not wash. A majority of the trustees in this case were union officers illegally controlling the fund, and it was that very illegality which permitted them to delegate to the Union, which had divided loyalties, the responsibility for dealing with the mine operators. This was a breach of their duty of loyalty. The Union participated in it. The measure of its responsibility for that participation is a fiduciary measure, and the burden of establishing that the losses would have occurred despite its participation was on the Union, not on the pensioners.
 
 
 103
 The district court refused to attribute to the Union the negligence of the Union officer trustees, reasoning:
 
 
 104
 "If the Union trustees acted as agents of the Union in their capacity as trustees, then they would have violated their duty of loyalty to the beneficiaries. As has already been held, supra, there is no breach of the duty of loyalty in this case." Joint Appendix at 144a-145a.
 
 
 105
 This reasoning disregards the facts, as well as the Congressional command of the equal representation provision of § 302(c)(5). The Union was in control of the Fund, in a manner forbidden by the statute. The Union officer trustees did in fact turn over to the Union in the relevant period, responsibility for dealing with the mine operators. Such meager enforcement efforts as were made were those of the Union, not the Trustees. Those efforts did not meet the standard of care of common skill, common prudence and common caution which reasonable men would be expected to exercise with respect to their own property. If they had, the court could not have found the trustees to be negligent. Since the Union put itself in the position of dominating the Fund in a manner forbidden by § 302(c)(5) it cannot escape liability for its negligent handling of delinquent royalty payments.
 
 
 106
 The Union urges that in the event it is held liable it should be permitted to reduce its damages by the total amount it loaned the fund since 1951. Over the years, loans totaling.$9,247,334 were made by the Union, at times when the precarious condition of the Fund might have forced suspension of pension payments. Of the.$9,247,334 some $1,945,000, loaned since January 1974 remains due. In the years from 1951 to 1953 the Union loaned the Fund $4,403,334. These loans were unilaterally forgiven by action of the Union's International Executive Board on July 14, 1959, by the resolution quoted in the margin.[38] In the years 1960-1961 the Union loaned the Fund $2,885,000. On January 21, 1970, five years after the instant lawsuit was started, the Executive Board voted to its treasurer "the authority to write that $2,885,000 off as an asset of the Mine Workers Union and wipe it off our books, the same as we did before." Joint Appendix at 263a-264a.
 
 
 107
 The Union urges that either the rule prohibiting double recovery or the doctrine of equitable recoupment should result in a reduction of its liability by the amount forgiven. The district court, without distinguishing between the two separate transactions, concluded that the rule against double recovery was applicable.
 
 
 108
 The record contains no evidence as to the purpose of the forgiveness of indebtedness other than the quoted resolutions of the executive board. There is, however, evidence that the Fund's financial difficulties arose not only from the failure to collect delinquent royalties, but also, and in much larger degree, from the decline in anthracite production. There is no evidence in the record from which it could be found that the 1959 forgiveness of indebtedness was intended to be in reparation for the failure to collect royalties. There is at least a scintilla of evidence that the January 21, 1970 forgiveness of indebtedness was so intended, since the motion was made in the context of a discussion of delinquencies and pensioner dissatisfaction. The district court made no distinction between the two transactions, concluding that
 
 
 109
 " . . . the forgiveness of the loans, rather than indicating an intent to make a gift, was more likely a recognition that the loans could never be repaid by the Fund."
 
 
 110
 It held, therefore, that if the Union were to be held liable, it should be permitted to set off the forgiven loan balance against the proven damages.
 
 
 111
 We express no opinion on whether the intent behind the loan forgiveness should be dispositive on the question whether a set-off is allowable. The issue has not been raised before this court, and should be presented to the district court on remand. But clearly if the sums forgiven were gifts, no set-off should be allowed. Certainly a donor to an irrevocable trust could not set off his liability for participation in a breach of trust by the amount of his gift. Set-offs of trust funds are unavailable to trustees against their liability in another capacity.[39] The district court's conclusion that no gift was intended is highly speculative in the absence of any real evidence of the Executive Board's intention. If the pensioners had the burden of proof on that issue we could affirm that part of the decision. But although the court did not specifically address the burden of proof question in that part of its opinion, it would appear to have addressed the gift problem making the same assumptions as to burden which we earlier held to be error. When one in a fiduciary relationship asserts a set-off to a liability for participating in a breach of trust, the burden, it seems to us, should be on him to establish that the transaction on which he relies properly qualifies for that set-off. Since we do not believe the district court considered the set-off issue in that light, a remand for reconsideration is appropriate.
 
 
 112
 The judgment of the district court will be vacated and the case remanded for further proceedings in which the liability of the Union shall be redetermined by the application of the fiduciary standards of conduct and burden of proof set forth in this opinion.
 
 
 
 [1]
 E. g., Thomas v. Honeybrook Mines, Inc., 428 F.2d 981 (3d Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971)
 
 
 [2]
 Nedd v. United Mine Workers of America, 225 F.Supp. 750 (E.D.Pa.1963), aff'd 332 F.2d 373 (3d Cir. 1964) (per curiam)
 
 
 [3]
 Nedd v. United Mine Workers, 400 F.2d 103 (3d Cir. 1968)
 
 
 [4]
 That section provides:
 (t)he district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.
 Implicitly, we recognized that there would be § 1331 jurisdiction as well, since all § 1337 cases, save those where the amount in controversy is less than $10,000, also meet the requirements of 28 U.S.C. § 1331. See Jersey Central Power & Light Co. v. Local Union No. 327, etc., of I.B.E.W., 508 F.2d 687, 699 n.34 (3d Cir. 1975), vacated on other grounds sub nom. Equal Employment Opportunity Comm'n. v. Jersey Central Power & Light Co. et al., 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976).
 
 
 [5]
 Nedd v. United Mine Workers, Civil No. 8796 (M.D.Pa., Apr. 13, 1976)
 
 
 [6]
 The court then said:
 (n)otwithstanding the jurisdictional conclusions hereinbefore articulated, in order to completely fulfill this Court's responsibilities as a trial court and to ensure a final resolution of this protracted lawsuit in the event that an appellate court determines that there is federal jurisdiction here, I will address myself to the question whether, assuming federal jurisdiction of the issues in this case, plaintiffs are entitled to relief.
 
 
 [7]
 Our prior decision merely established that the union was not by contract obligated to enforce the royalty provisions of the Anthracite Wage Agreement. The Trustees were not then before the court, nor did we then have occasion to consider the issue of liability for destruction of bargained-for benefits
 Moreover, plaintiffs urge that our prior decision is not controlling because this court failed to consider the impact of certain relevant contractual provisions. We have examined the proffered contract, and conclude that it does not require any revision of our previous ruling with respect to the Union's contractual obligation to undertake collection of the royalties. There is no such obligation.
 
 
 [8]
 See Note, Pension Plans and the Rights of the Retired Worker, 70 Colum.L.Rev. 909, 922 n.64 (1970)
 
 
 [9]
 Id.; Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960)
 
 
 [10]
 Note, supra n.8, at 922 n.64; Restatement (2d) of Trusts, § 282(2) (1959); 4 A. Corbin, Contracts, § 779A (1950). An action by a trust beneficiary is rooted in the law of trusts rather than of contracts. Yet, as Corbin points out, a suit by a trust cestui is essentially similar to a suit by a third party donee beneficiary. In either event, a non-party to the original instrument, who has given no consideration for the benefit afforded him, is entitled to press for performance of obligations undertaken for his benefit. Although the cause of action in the case at bench against the trustees arises from the trust relationship, it is plain that the source of the rights asserted is the collective bargaining agreement
 
 
 [11]
 See n.10 supra
 
 
 [12]
 Cf. Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Rev. 911, 930-31 (1970); Herbert, Investment Regulation and Conflicts of Interest in Employer-Managed Pension Plans, 17 B.C. Ind. & Comm'l. L.Rev. 127, 147, 148 (1976) (arguing that state trust law is both inconsistent and inadequate to protect beneficiaries, and that § 302 was intended to create a federal trust law standard). Our conclusion is only that a claim of tortious interference with a collective bargaining agreement by a Fund Trustee states a non-frivolous cause of action under § 301 of the Taft-Hartley Act sufficient to support pendent jurisdiction of state law claims in federal court. That conclusion follows from two premises: first, that § 302(e) establishes a federal forum in which to try claims of a breach of fiduciary duty by a union pension fund trustee; and second, that § 301 provides a federal forum for claims of a violation of a collective bargaining agreement. The instant claim against the trustees partakes of both. It is essentially the same as the cause of action described in 4 A. Corbin, Contracts, § 779A, n.61 (1950). See n.10 supra. The issue before us is neither the legitimacy of such a cause of action nor the capacity of federal common law to encompass it, but rather the appropriateness of couching it in terms of § 301. As § 301 has been recognized as a source of federal common law of labor contracts since Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957), we conclude that the pensioner plaintiffs' complaint arose under 29 U.S.C. § 301 and 28 U.S.C. § 1337
 
 
 [13]
 The district court relied on Bowers v. Ulpiano Casal, Inc., 393 F.2d 421 (1st Cir. 1968). That case held that § 301 did not give federal courts jurisdiction of a fund trustees' suit to redress a wrongful diversion of monies from the fund, where such wrongful diversion was alleged to be a violation of the collective bargaining agreement. However, we read that holding as a standing decision rather than a more general judgment on the question of a cause of action for tortious interference with contract under § 301. The First Circuit wrote:
 Appellants contend that as long as the contract is between an employer and a labor organization, "any party who claims rights thereunder may sue for breach", citing Smith v. Evening News Ass'n., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). In Smith, the Court allowed individual employees to sue employers under section 301, reasoning that restricting section 301 to "labor organizations" would stultify congressional policy in that employee claims are "to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based." Smith, supra at 200, 83 S.Ct. at 270.
 It is difficult to see how such a rationale could justify allowing third parties who are not employers, unions, or employees to bring suit under this section. 393 F.2d at 423 (emphasis supplied).
 The First Circuit failed to consider Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), which preceded Smith and left no doubt of the Trustees' standing to enforce a contribution provision of a collective bargaining agreement to which they were not parties. Thus, we disagree with the First Circuit's standing conclusion, and do not feel constrained, as did the district court, to follow the First Circuit's dictum concerning the applicability of § 301 to a breach of fiduciary duty. While we certainly do not hold that all breaches of fiduciary duty may be redressed in an action under § 301 of the Labor Management Relations Act, sound public policy compels the conclusion that § 301 supports a federal common law cause of action for tortious interference with a collective bargaining agreement by a pension fund trustee, in violation of his fiduciary duty to the pensioners.
 All that we have said with respect to the claim against the Trustees is a fortiori true with respect to a similar claim against the Union, which was a party to the collective bargaining agreement and which controlled the Trustees.
 
 
 [14]
 The most recent statement of that standard is found in the Supreme Court's opinion in Mt. Healthy School Dist. v. Doyle, 429 U.S. 274, 279, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977):
 . . . where an action is brought under § 1331, the catch-all federal question provision requiring $10,000 in controversy, jurisdiction is sufficiently established by allegation of a claim under the Constitution or federal statutes, unless it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction . . ." Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Montana-Dakota Utilities v. Public Service Co., 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951).
 The federal standard of substantiality is also set forth at length in Hagans v. Levine, 415 U.S. 528, 536-38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). See especially 415 U.S. at 538, 94 S.Ct. at 1379, where the Court, quoting prior authority, held that
 (a) claim is insubstantial only if " 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' "
 
 
 [15]
 E. g., Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Nedd v. United Mine Workers, supra, 400 F.2d at 106; Brady v. Trans World Airlines, Inc., 401 F.2d 87, 94 (3d Cir. 1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969)
 
 
 [16]
 Section 302(a), (b), 29 U.S.C. § 186(a), (b) provides:
 (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value
 (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
 (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or
 (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
 (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
 (b) (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
 (2) It shall be unlawful for any labor organization, or for any person acting as an officer, agent, representative, or employee of such labor organization, to demand or accept from the operator of any motor vehicle (as defined in part II of the Interstate Commerce Act) employed in the transportation of property in commerce, or the employer of any such operator, any money or other thing of value payable to such organization or to an officer, agent, representative or employee thereof as a fee or charge for the unloading, or in connection with the unloading, of the cargo of such vehicle: Provided, That nothing in this paragraph shall be construed to make unlawful any payment by an employer to any of his employees as compensation for their services as employees.
 
 
 [17]
 Section 302(c)(5), 29 U.S.C. § 186(c)(5) provides:
 (c) The provisions of this section shall not be applicable
 (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.
 
 
 [18]
 An allegation of "structural violations" is sufficient to vest jurisdiction under 29 U.S.C. § 186 and 28 U.S.C. § 1337. Lugo v. Emp. Retire. Fund, 529 F.2d 251, 254-56 (2d Cir. 1976). Johnson v. Botica, 537 F.2d 930, 933 (7th Cir. 1976). Compare Giordani v. Hoffmann, 295 F.Supp. 463, 471-72 (E.D.Pa.1969) (allegation of § 302(c) violation sufficient to create jurisdiction) with Bowers v. Ulpiano Casal, Inc., supra, 393 F.2d at 426 (jurisdiction lacking where complaint failed to allege a violation of § 302(c) (5) standards). Clearly, the amended complaint was sufficient to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(1). See n. 14, supra
 However, Tully v. Mott Supermarkets, 540 F.2d 187, 196 (3d Cir. 1976), requires us, where the existence of pendent jurisdiction is at issue, to examine the cause of action and to determine whether it can withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). For it is an abuse of discretion for a district court to exercise pendent jurisdiction where the federal claim is frivolous. Id. See also Johnson v. Botica, supra, 537 F.2d at 933 n. 2.
 
 
 [19]
 Some courts have taken a narrow view of § 302(e). E. g., Bowers v. Moreno, 520 F.2d 843, 846 (1st Cir. 1975); Snider v. All State Administrators, 481 F.2d 387, 390 (5th Cir. 1973), cert. denied, 415 U.S. 957, 94 S.Ct. 1484, 39 L.Ed.2d 571 (1974). Others, most notably the district courts of this Circuit, have read that section less restrictively. E. g., Porter v. Teamsters, etc. Funds, 321 F.Supp. 101, 104 (E.D.Pa.1970); Giordani v. Hoffmann, 295 F.Supp. 463, 472 & n. 3 (E.D.Pa.1969); Raymond v. Hoffmann, 284 F.Supp. 596, 601-02 (E.D.Pa.1966)
 
 
 [20]
 See n. 19, supra
 
 
 [21]
 Act of October 15, 1914, c. 323, §§ 6, 20, 38 Stat. 731, 738 (1914), 15 U.S.C. § 17, 29 U.S.C. § 52
 
 
 [22]
 Act of March 23, 1932, c. 90, 47 Stat. 70-73 (1932), as amended, 29 U.S.C. §§ 101-110, 113-115
 
 
 [23]
 See Moses v. Ammond, 162 F.Supp. 866, 869-70 (S.D.N.Y.1958):
 I do not believe that 29 U.S.C.A. § 186(e), in itself, vests any jurisdiction in the District Courts. Such an interpretation would be possible if the subsection . . . ended after the words "restrain violations of this section." But the subsection as a whole indicates, I believe, that its purpose was to remove the bar of sections 6 and 20 of the Clayton Act, 38 Stat. 731, 738 (1914), 15 U.S.C.A. § 17, 29 U.S.C.A. § 52, and the bar of the Norris-LaGuardia Act, 47 Stat. 70 (1932), as amended, 29 U.S.C.A. §§ 101-110, 113-115, so as to permit the courts of the United States, in cases in which jurisdiction was otherwise present, to enjoin violations of subsections (a) and (b) of 29 U.S.C.A. § 186.
 See also Note, 72 Harv.L.Rev. 778 (1959).
 
 
 [24]
 Senator Ball stated:
 "(s)ubsection (e) gives the district courts jurisdiction to restrain and to punish violations of the section, notwithstanding the provisions of the Norris-LaGuardia Act." 93 Cong.Rec. 4678 (1947).
 
 
 [25]
 The defendants place great reliance on Justice Stewart's statement in Arroyo v. United States, 359 U.S. 419, 427, 79 S.Ct. 864, 869, 3 L.Ed.2d 915 (1959) that "(t)he legislative history (of § 302) is devoid of any suggestion that defalcating trustees were to be held accountable under federal law, except by way of the injunctive remedy provided in that subsection." Arroyo was an appeal from a federal criminal conviction of an employer representative who embezzled welfare funds. The quoted language is simply a rejection of the contention that § 302 is the source of a federal common law crime not expressly defined by statute. Since it is well established that there are no federal common law crimes, and that all federal crimes are defined by statute, Justice Stewart's observation is simply inapposite to the question presently before us
 
 
 [26]
 When an early draft of the Labor Management Relations Act of 1947 was reported out of committee, it lacked § 302. In fact, section 8(a)(2)(C)(ii) of that bill made it an unfair labor practice for an employer to contribute to any union fund or trust. See H.R.3020, 80th Cong., 1st Sess., § 8(a)(2)(C)(ii), reprinted in NLRB, Legislative History of the Labor Management Relations Act of 1947, pp. 50-51 (1948) (hereinafter referred to as "Leg.Hist.") Section 302 did not appear until the passage by the Senate of the Ball Amendment, cosponsored by Sens. Ball, Byrd, George and Smith. The statements by § 302's supporters make plain the purpose of that section:
 "Mr. President, the sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute them, and that they shall not degenerate into bribes." 93 Cong.Rec. 4805 (1947), Leg.Hist. at 1302 (Remarks of Sen. Ball).
 "The purpose of the amendment is to require that the fund shall be established in definite, detailed form . . . (t)he purpose is to prevent the abuse of welfare funds . . .. Certainly unless we impose some restrictions we shall find that the welfare fund will become merely a war chest for the particular union, and that the employees for whose benefit it is supposed to be established, for certain definite welfare purposes, will have no legal rights and will not receive the kind of benefits to which they are entitled after such deductions from their wages." 93 Cong.Rec. 4876-77 (1947), Leg.Hist. at 1310-13 (Remarks of Sen. Taft).
 "Mr. President all seek to do by the amendment is to make sure that the employees whose labor builds this fund and who are really entitled to benefits under it shall receive the benefits; that it is a trust fund, and that, if necessary, they can go into court and obtain the benefits to which they are entitled.
 
 
 [93]
 Cong.Rec. 4883 (1947), Leg.Hist. at 1322 (Remarks of Sen. Ball)
 It is beyond question that § 302 was enacted for the "especial benefit" of the beneficiaries of union welfare and pension funds. The chief protection Congress sought to provide was protection from exploitation of the fund by Union officials for improper purposes. See, e. g., Arroyo v. United States, supra, 359 U.S. at 425-26, 79 S.Ct. 864; United States v. Ryan, 350 U.S. 299, 304-06, 76 S.Ct. 400, 100 L.Ed. 335 (1956); Alvares v. Erickson, 514 F.2d 156, 164 (9th Cir. 1975); Bowers v. Ulpiano Casal, supra, 393 F.2d at 425; 2 U.S.Code Cong. & Admin.News, pp. 2326-31 (1959) (LMRDA amendments to § 302 of LMRA); 1 U.S.Code Cong. & Admin.News pp. 1159-60 (1969) (P.L. 91-86, amending § 302(c)).
 
 
 [27]
 See pp. 201-203 and nn. 19, 23 & 24, supra
 
 
 [28]
 Section 302(d) addresses criminal violations, but § 302(e) plainly contemplates enforcement by means other than indictment. Moreover, § 302(e) is not limited, by terms, to § 302(c)(5) violations, and would appear to apply with equal force to § 302(a) and (b). We will not endorse a federal law of remedies that would prohibit a court, properly entering a restraining order, from awarding damages incidental to equitable relief. But cf. Arroyo v. United States, supra, 359 U.S. at 424, 79 S.Ct. 864; Goetz, Employee Benefit Trusts Under Section 302 of the Labor Management Relations Act, 59 N.W.U.L.Rev. 719, 720 (1965) (§ 302 a "criminal statute")
 
 
 [29]
 Section 302 does not apply to public employee unions. See Crilly v. SEPTA, 529 F.2d 1355 (3d Cir. 1976)
 
 
 [30]
 The Fund exists as a hybrid creature of both state and federal law. It was chartered and achieved entity status under state law. Federal labor law both sanctions the bargaining process, the very genesis of the Fund, and prescribes the structure and purpose of the Fund. As noted above, supra, n. 10, the laws of both trusts and of labor contracts are relevant to a section 302 fund. See also Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Rev. 911, 926 (1970). But to conclude that because state law traditionally governs trusts no federal cause of action may be implied from § 302 is to say that state law preempts federal law where both apply to a subject of federal legislation. Without a Congressional statement of intent to arrive at that accommodation, such a conclusion is insupportable
 
 
 [31]
 Although we need not decide the question, it seems plain that the proper conclusion is that federal law should preempt all state law inconsistent with the federal common law standards for fiduciary conduct by union pension fund trustees. See, e. g., Employee Retirement Income Security Act of 1974, 88 Stat. 829 et seq., 93d Cong., 2d Sess. (1974). Section 514(a) of the Act, 29 U.S.C. § 1144(a) provides:
 (a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.
 This subsection mandates federal supremacy of Part IV of Subchapter I, dealing with trustees' fiduciary duties, over inconsistent state laws. That Part, §§ 401-414 of the Act, 29 U.S.C. §§ 1101-1114, states the basic rules of federal fiduciary duty in § 404, 29 U.S.C. § 1104, which provides:
 (a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.
 (2) In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).
 (b) Except as authorized by the Secretary by regulation, no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States.
 (c) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)
 (1) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and
 (2) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.
 The heart of this provision is § 1104(a)(1)(B), which establishes a "prudent man" standard. This rule, which supersedes all inconsistent state law, is no different from, nor more explicit than, the federal fiduciary duty under § 302 of the Taft-Hartley Act. Indeed, ERISA has been criticized for that reason. See, Herbert, Investment Regulation and Conflicts of Interest in Employer-Managed Pension Plans, 17 B.C. Ind. & Com. L.Rev. 127, 148, 157 (1976).
 Section 514 of ERISA, 29 U.S.C. § 1144, plainly indicates that it does not govern the suit presently before us. Any fiduciary duties applicable to the present case must be fashioned from federal common law under § 302. But Congress' plain intent to apply the § 302 standard preemptively in Subchapter I, Part 4 of ERISA, guides us to a like conclusion for § 302 common law. See Landis, Statutes and the Sources of Law, in Harvard Legal Essays 213, 226-27 (1934) (a legislative establishment of policy sometimes carries significance beyond the particular scope of the statute involved).
 
 
 [32]
 See cases cited in n. 19, supra. See also Goetz, supra n. 30, at 926-929
 
 
 [33]
 In Brady v. Trans World Airlines, Inc., 196 F.Supp. 504, 507 (D.Del.1961) the court in dicta suggested that causes of action implied from federal statutes, being unknown at common law, did not require a jury trial. This court somewhat cryptically approved that suggestion. 401 F.2d 87, 96 n. 32. Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), would seem to have overruled any doctrine that new statutory remedies are outside the reach of the seventh amendment. Id. at 193-94, 94 S.Ct. 1005
 
 
 [34]
 E. g., Hammonds v. Aetna Casualty & Surety Co., 243 F.Supp. 793, 803 (N.D.Ohio 1965); In Re Van Sweringen Co., 119 F.2d 231, 234 (6th Cir. 1941); Food Fair Stores, Inc. v. Greeley, 264 Md. 105, 285 A.2d 632 (1972); Shuster v. North American Mortgage Loan Co., 139 Ohio St. 315, 40 N.E.2d 130 (1942); Proctor v. Norris, 285 Mass. 161, 188 N.E. 625 (1934); Anderson v. Daley, 38 App.Div. 505, 56 N.Y.Supp. 511 (1899), appeal dismissed, 159 N.Y. 146, 53 N.E. 753 (1899); IV Scott on Trusts § 326.5, p. 2570 (3d ed. 1967); American Law Institute, Restatement (Second) of Trusts § 326 (1959); Annotation, Employer's Liability for Action of Trustee or Similar Body Administering Employer's Pension Plan, 54 A.L.R.3d 189, 191 (1973); Scott, Participation in Breach of Trust, 38 Trust Bull. 41 (Dec. 1958). Cf. Carroll v. Brotherhood of Railroad Trainmen, 417 F.2d 1025, 1028 (1st Cir. 1969) (recognizing rule of § 326 of Restatement 2d); Chester-Cambridge Bank & Trust Co. v. Rhodes, 346 Pa. 427, 433-34, 31 A.2d 128, 132 (1943) (acknowledging rule as stated by Scott and Restatement, but declining to find liability against third parties who lacked knowledge of breach of fiduciary duty)
 
 
 [35]
 See Joint Appendix at 104a-105a
 
 
 [36]
 Although this is a federal common law rule of union pension fund trustees' fiduciary duty, we think it is consistent with state law as well. See, e. g., Estate of Stetson, 463 Pa. 64, 84, 345 A.2d 679, 690 (1975); Branch v. White, 99 N.J.Super. 295, 313, 239 A.2d 665, 674, cert. denied, 51 N.J. 464, 242 A.2d 13 (1968). Cf. American Law Institute, Restatement (Second) of Trusts § 212(4) (1959)
 
 
 [37]
 See also, In Re Estate of Maurice, 433 Pa. 103, 108, 249 A.2d 334, 336 (1969); Brown's Estate, 287 Pa. 499, 501-02, 135 A. 112, 113 (1926); Societa Operaia Di Mutuo Soccorso Villalba v. DiMaria, 40 N.J.Super. 344, 349, 122 A.2d 897, 898-99 (1956)
 
 
 [38]
 "Resolved, that the International Executive Board in session this day, in consideration of a loan of long standing made from time to time by the International Union to the Anthracite Health and Welfare Fund, designed to make possible the continued payment of $50 per month pension now in effect, be forgiven, canceled as obligations, and the promissory notes bearing on same be nullified; that the Secretary-Treasurer of the International Union be authorized and instructed to advise the Anthracite Health and Welfare Fund of this action, and attend to all necessary details incident to the implementation of this declaration, all in the interests of the members of the United Mine Workers of America in Districts 1, 7 and 9, as represented by this International Executive Board." Joint Appendix at 233a
 
 
 [39]
 See Annotation, "Right of trustee to withhold trust payments from beneficiary to obtain payment of personal debt of latter to him, or to set off such debt against payment to beneficiary," 8 A.L.R.2d 209 (1949); 76 Am.Jur.2d, Trusts § 599, p. 805 n. 38 (1975), and cases there cited