586 F.2d 1367
 99 L.R.R.M. (BNA) 3239, 84 Lab.Cas. P 10,897,
1 Employee Benefits Ca 1306
 DENVER METROPOLITAN ASSOCIATION OF PLUMBING, HEATING,
COOLING CONTRACTORS, a Colorado Corporation and
Mechanical Contractors' Association of
Colorado, a Colorado
Corporation,
Plaintiffs-
Appellants,
v.
JOURNEYMAN PLUMBERS & GAS FITTERS LOCAL NO. 3 & PIPEFITTERS
LOCAL NO. 208 of the United Association of Journeymen &
Apprentices of the Plumbing& Pipefitting Industry of the
United States and Canada (AFL-CIO), Richard T. Crabb, Ronald
Solomon, Carl Reid, Don Beatty, Individually and as members
of the Denver Plumbers Joint Apprenticeship Committee, Dave
Schoen, Larry Schaap, H. J. Hall, Charles Recene, Jack
Schofield, Gerald Emerick, Steve Silva, Harold Mowery,
Individually and as members of the Denver Pipe Fitters Joint
Apprenticeship Committee, Al Kitzelman, Bill Wafer, Paul
Emerick, Bud Hutto, Individually and as Trustees of the
Denver Pipe Industry Vacation Fund, Defendants-Appellees.
 No. 76-2039.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 17, 1978.
Decided Nov. 13, 1978.
 
 Donald B. Gentry of Grant, McHendrie, Haines & Crouse, Denver, Colo., for plaintiffs-appellants.
 Martin D. Buckley, Denver, Colo. (Philip Hornbein, Jr., Denver, Colo., with him on the brief), of Hornbein, MacDonald & Fattor, Denver, Colo., for defendants-appellees.
 Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This is an appeal from a grant of summary judgment by the district court. The suit was instituted by the Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors and the Mechanical Contractors' Association of Colorado (associations), whose members are certain employers in the plumbing and pipe fitting industry. They alleged that the defendants-appellees (unions and trustees of three trust funds) violated the "written agreement" and "equal representation" requirements of 29 U.S.C. § 186(c)(5)(B) in the administration of the trust funds. The failure of the union trustees to administer the trust funds in conformity with § 186 was also alleged to be a breach of the collective bargaining agreement between the parties, allowing suit to be brought under 29 U.S.C. § 185(a).
 
 
 2
 A brief background of the collective bargaining history and relevant statutes will aid in understanding our resolution of the issues. The three trusts involved are Denver Pipe Industry Vacation Fund Trust, Denver Plumbers Apprentice and Journeyman Training Fund Trust, and Denver Pipe Fitters Apprenticeship Fund Trust, all established over a period from 1963 to 1965 pursuant to collective bargaining contracts between the associations and unions. The training trusts were to provide programs for training apprenticeship plumbers and pipe fitters, while the vacation trust was to provide paid vacations for employees in the industry. Each were stated in separate trust agreements entered into by the parties.
 
 
 3
 The relevant governing statute is 29 U.S.C. § 186(a)(1) which generally prohibits payments by an employer to employee representatives. However, 29 U.S.C. § 186(c)(5) and (6) grants exceptions from the general prohibition, provided certain requirements are met, as here relevant, "the detailed basis on which such payments are to be made is specified in a Written agreement with the employer, and Employees and employers are equally represented in the administration of such fund, . . ." 29 U.S.C. § 186(c)(5)(B). (Emphasis supplied.)
 
 
 4
 The parties here had a written collective bargaining agreement and written trust agreements. There were also equal numbers of association and union trustees acting with respect to each trust.
 
 
 5
 Since the establishment of the trust funds, employers who were not members of or represented by the associations have made payments into the trust funds as required by contracts they have negotiated with the unions. In this group are four types of employers (numbers are those in the group when this suit was instituted): 1) Twenty-nine independent employers who sign or "adopt" the contract negotiated between the associations and the unions; 2) thirty-three members of the Refrigeration and Air-Conditioning Contractors Association (RACCA), which negotiates separately with the unions and whose contract also requires trust fund payments; 3) twenty-two national contractors who contribute based upon a national agreement with the international union parent organization of the defendant locals; 4) forty-five employers who have not adopted the current association/union contract, but continue to contribute based on the previous contract between the associations and unions.
 
 
 6
 In 1974 the associations established a Contract Administration Fund (CAF) and sought to negotiate a change in the collective bargaining agreement which would prohibit employers from contributing to the various trust funds unless they were association members or represented by the association, such representation presumably coming from membership in the CAF which was open to all employers. The unions rejected the proposal. The issue was submitted to binding arbitration and unanimously decided against the associations.
 
 
 7
 This suit was then commenced, based on the theories stated above. As is here relevant, the district court granted summary judgment for the defendants on the question of whether the complained of actions violated the collective bargaining agreement. The court did not reach the issue of whether the written agreement or equal representation requirements of § 186(c)(5)(B) had been violated, holding that the plaintiff associations had no standing to challenge the alleged violations of that section.
 
 
 8
 * We examine first the claim that the collective bargaining agreement has been violated. As to this the court clearly has jurisdiction under 29 U.S.C. § 185(a). It is the associations' contention that the unions are breaching the collective bargaining contract and the various trust agreements by signing contracts with employers which allow and require such employers to contribute to the trust funds even though they are neither association members nor contribute to the associations' Contract Administration Fund.
 
 
 9
 Except with respect to the legality argument considered below, the determination of this issue depends entirely upon what was the agreement of the parties. We do not quarrel with appellants' contention that a third party cannot be added to a contract without the consent of both original parties. Kruschke v. Quatsoe, 49 Colo. 312, 112 P. 769 (1911). That consent, of course, can be given in advance. The question here is what the parties contemplated with respect to nonmembers of the association.
 
 
 10
 The wording of the trust agreements and collective bargaining agreement obviously contemplates that nonassociation members can adopt the agreement. In the preamble of the collective bargaining agreement it is said:
 
 
 11
 The signing of this Agreement by an Employer not a participating member of either Association which incorporates this Joint Agreement by reference and its acceptance by the Union shall bind said Employer to comply with all the terms, conditions and provisions of this Contract and Joint Agreement including, but not limited to the assignment of bargaining rights to the Association, or either of them.
 
 
 12
 In Art. II, Sec. 3, the collective bargaining agreement states "The Unions shall upon request by the Association advise the Association of all employers who are signatory to this agreement." In several other places there are references to an employer party to the agreement "or (who) has accepted its provisions" (Art. II, Sec. 1), "or have adopted or have worked under this agreement . . ." (Art. VIII, Sec. 2. See also Art. VIII, Sec. 3.) Apparently similar language has been contained in all agreements since 1963.
 
 
 13
 The two apprentice and training fund trust agreements are virtually identical. In Section 2 of those instruments reference is made to "employers accepting the provision thereof," meaning either the associations/unions collective bargaining agreement or its provisions for contributions to this fund. Both trusts contain references in generalized form to "employers" paying into the fund, but specifically refer to the "Employer Association" as the only entity which may name employer trustees and agree to changes in the trust. The vacation fund trust indenture defines "employer" to mean "any employer in the pipe industry in Colorado who makes payments to the Vacation Fund under this Trust indenture," and "employee" as "every employee whose employment is governed by the provisions of a collective bargaining agreement."
 
 
 14
 The associations argue that no employer can make payments to the fringe benefit trusts without assigning all rights over collective bargaining generally to the associations, including obligating themselves to make payments into the Contract Administration Fund. The unions claim the reference to assignment of bargaining rights, if applicable at all to the fringe benefit fund payments, merely delegates to the associations the power to negotiate changes in the trust indentures and accepts their appointment of trustees.
 
 
 15
 In determining intent the trial court was obviously impressed, as are we, with the fact that nonmember organizations were allowed to contribute to these trusts for some ten years without complaint by the associations, and only now has objection been made to the practice. The past actions and practices of the parties to a contract are to be accorded substantial weight in determining its proper interpretation, particularly if the conduct manifesting their construction occurred prior to any controversy. Fanderlik-Locke Co. v. United States, 285 F.2d 939 (10th Cir. 1960).
 
 
 16
 In negotiations with the unions the associations proposed a new preamble to Article VI of the collective bargaining contract to prohibit outside employers from contributing to these trusts. This was rejected by the union and turned down by the Industrial Relations Council, in what the unions contend is an arbitration decision binding upon the associations. We do not decide that issue, but note the attempt as supportive of the construction that without the change the nonmember employers were entitled to make contributions by incorporating by reference the trust agreements in their contracts with the unions.
 
 
 17
 Finally, the unions' construction is supported by the nature of the building trade industry involved. Since plumbers and pipe fitters work for many different employers on different jobs over a relatively short period of time, as a practical matter their paid vacations may have to be handled through a central fund with contributions based upon the hours they work for particular employers. The apprentice training trusts are to promote and administer area-wide training programs, and it would be most difficult to confine all of the benefit to association members.
 
 II
 
 18
 Jurisdiction is conferred upon United States district courts to restrain violations of Section 302 of the Labor Management Relations Act. 29 U.S.C. § 186(e). The associations assert that the court had jurisdiction under this section to entertain its suit to challenge the payments by the outside employers as violative of the "written agreement" and "equal representation" requirements of 29 U.S.C. § 186(c)(5)(B). The trial court did not reach this issue because it found the associations had no standing to challenge the alleged violations of that section.
 
 
 19
 In its ruling upon standing the trial court relied upon Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), which established a two-part test for determining standing to sue. Article III's "case or controversy" requirement is the basis for the first test, that plaintiff must allege an "injury in fact" which has resulted from the challenged action. The second part asks whether the complainant's interest is within the "zone of interest to be protected by the statute." In holding that the associations were not within the zone of interest to be protected, the trial court said the plaintiffs have standing "to enjoin violations of Section 186 only by or on behalf of its contributing members," citing Employing Plasterers' Ass'n v. Journeymen Plasterers' Protective & Benevolent Society Local 5, 186 F.Supp. 91 (N.D.Ill.1960) which held an association could not enjoin payments to fringe benefit funds by nonmember employers.
 
 
 20
 We think that is too narrow a reading of the law. The associations here were parties to these trust agreements and have contracts requiring their member employers to contribute. The associations name the employer trustees. Apparently they also pay employer trustee salaries, as the agreements state that no salaries are to be paid from the trusts. While the trustees undoubtedly have the same fiduciary responsibilities imposed upon individual trustees under general trust law, in terms of the statute they still "represent" employers and they may have discretionary powers involving policy or judgment where they may differ from the union trustees. See Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Rev. 911, 921-925 (1970). This is one of the reasons such trusts are required by 29 U.S.C. § 186(c)(5)(B) to have provisions for an impartial umpire to break deadlocks.
 
 
 21
 Cases have recognized the rights of employer associations to sue under Sec. 186(e) on behalf of their member employers. Mobile Mechanical Contractors Ass'n, Inc. v. Carlough, 566 F.2d 1213 (5th Cir. 1977); Employing Plasterers' Ass'n v. Journeymen Plasterers' Protective and Benevolent Society Local 5, 279 F.2d 92 (7th Cir. 1960); Mechanical Contractors Ass'n v. Local 420 AFL-CIO, 265 F.2d 607 (3d Cir. 1959). While courts have declined under this section to entertain suits to challenge some types of fiduciary breaches by trustees, jurisdiction has been asserted to restrain "violations of basic structure, as determined by the Congress, . . ." Bowers v. Ulpiano Casal, Inc., 393 F.2d 421, 424 (1st Cir. 1968). See also Lewis v. Mill Ridge Coals, Inc., 298 F.2d 552, 558 (6th Cir. 1962). Courts have entertained suits to decide: whether these § 186(c)(5)(B) trusts may cover retired and other employees, Blassie v. Kroger Co., 345 F.2d 58 (8th Cir. 1965); if union members of a joint board to administer an industrial fund are "representatives" within the proscription of the statute, Mechanical Contractors Ass'n v. Local 420, AFL-CIO, 265 F.2d 607 (3d Cir. 1959); and whether payments to an entity not organized as a trust are outside the purposes of the statute. Local 2, Operative Plasterers v. Paramount Plastering, Inc., 310 F.2d 179 (9th Cir. 1962).
 
 
 22
 We hold that a suit to determine whether contributing employers who are not members of the contracting associations must have a voice in naming the employer trustees, and whether other employers may lawfully adopt these trust agreements by reference in their contracts, involve the basic structure of Section 186 as enacted by Congress, and are questions with respect to which the associations have standing to sue. In so holding we note a recent decision of the National Labor Relations Board expressly declining to decide those questions on grounds that the statute delegates the determination exclusively to the courts. Sheet Metal Workers International Ass'n Local 493, 97 L.R.R.M. 1476 (1978).
 
 III
 
 23
 Since questions of law are involved and the facts are undisputed, we consider the arguments of the associations that the contributions by nonmember employers violate the "written agreement" and "equal representation" provisions of 29 U.S.C. § 186(c)(5)(B).
 
 
 24
 With respect to the statutory requirement that "payments are to be made as specified in a written agreement," 29 U.S.C. § 186(c)(5)(B), examining the purpose behind the requirement is helpful. The Congressional intent was to allow each employee to know and to have a basis for enforcing his rights, and to eliminate discretion in union leaders to divert the funds. Senator Taft made this clear in discussion on the Senate floor:
 
 
 25
 Then there is the provisions (sic) under (B) that "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." So that the purpose of the provision is that the welfare fund shall be a perfectly definite fund, that its purposes shall be stated so that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee.
 
 
 26
 The purpose of the amendment is to require that the fund shall be established in definite, detailed form, in the form of a trust fund, with respect to which the employees can determine their rights and can insist upon them.
 
 
 27
 93 Cong.Rec. 4746-4747 (1947).
 
 
 28
 In the instant case the trust agreements are in writing, and except for the equal representation contention treated below, there is no argument that the agreements are in any way deficient. In all cases, unless it is those of employers paying under expired contracts, there is a written provision in the currently operative collective bargaining agreements between the unions and the outside employers which require contributions to the trusts. By referencing the funds created by the associations/unions trust agreements, once the money is paid to the funds its disposition is governed by the trust instruments. No contention is made here that it is being diverted to persons not employees of a contributing employer, or that moneys are being paid out in improper amounts among participants.
 
 
 29
 As to those employers paying under expired contracts, who have not yet adopted the new associations/unions collective bargaining agreement, it is our view they too are making payments as specified in a written agreement. It has been held that payments continuing beyond the expiration of a collective bargaining agreement, pending the negotiation or acceptance of a new one are still under a written agreement. See Hinson v. NLRB, 428 F.2d 133, 139 (8th Cir. 1970):
 
 
 30
 There is a fatal gap in petitioner's chain of reasoning, and it lies in his first link. The reference in § 302(c)(5)(B) to a "written agreement with the employer" does not comprehend solely a collective bargaining agreement to the exclusion of any other possible written agreement. A trust fund agreement separate and apart from the collective bargaining agreement would surely satisfy the statutory prerequisite. See Doyle v. Shortman, 311 F.Supp. 187 (S.D.N.Y., March 3, 1970). Here, Article XX of the expired collective bargaining contract refers to a "Trust Agreement" in existence into which health and welfare benefit contributions were to be made. Article XXIV refers to an agreement of August 7, 1964, which established the "Meat Cutters Local 576 and Employers Kansas and Missouri Pension Plan." Petitioner certainly agreed to these separate trust fund agreements, not only because they are incorporated by reference into the collective bargaining contract itself, but also because he made contributions under each agreement from the date he purchased Hen House Market No. 3 to the date the subsisting collective bargaining contract expired on February 3. We believe that the two separate trust fund agreements in this case satisfy the requirement of § 302(c)(5)(B) for a "written agreement with the employer," even after termination of the collective bargaining agreement on February 3, 1968.
 
 
 31
 The other aspect of the written agreement argument is essentially an attack upon industry and area-wide multiemployer plans, and the discussion below is relevant. We have no problems holding that the written agreement test of the statute is met in all of the arrangements at issue here. See Alvares v. Erickson, 514 F.2d 156, 161 (9th Cir. 1975).
 
 
 32
 Multiemployer fringe benefit trusts are expressly contemplated by the statute, where in § 186(c)(5) reference is made to trust funds established for employees and their dependents "of such employer . . . jointly with the employees of other employers making similar payments . . ." In subsection (c)(5)(B) while reference is made to a written agreement with "the employer," it is said merely that "employees and employers are (to be) equally represented in the administration of such fund . . ." The contention that the trust agreement cannot be incorporated by reference by collective bargaining contracts with employers who are not members of the associations which were signatory parties to the original trusts is discussed in Professor Raymond Goetz's well-known article, Employee Benefit Trusts Under Section 302 of the Labor Management Relations Act, 59 Nw.L.Rev. 719, 747 (1967):
 
 
 33
 The argument has been advanced that this portion of the statute also requires that each contributing employer, or separate group of employers, participate in the selection of employer trustees. Lack of control over the selection of employer trustees, it is argued, results in lack of representation, contrary to the statutory requirements. The flaw in this argument is that the statute says nothing about the type of representation required, nor the procedure for appointment of representatives. The only requirement is that the representation of employers be equal to that of employees. Where the fund covers a number of employers, this does not require equal representation by Each employer. (Footnotes omitted.)
 
 
 34
 The associations' equal representation argument is essentially an attack on area or industry-wide trusts and on most multiemployer plans. In the context of deciding that adoption provisions similar to those the unions negotiated with nonmember employers are a mandatory subject of bargaining under the LMRA, the NLRB has recently discussed this argument:
 
 
 35
 Moreover, for us to suppose that Congress intended to afford each individual employer the unfettered right to select all of the management trustees in a multiemployer fund like SASMI would be to formulate a rule that would severely impair the continued development of such plans. For example, if each employer in a trust fund with 2,000 contributing employers were to possess and utilize the right to individually select its own trustee, it is readily apparent that the fund would become impossible to administer. This is especially so in view of the equal representation requirement of Section 302(c)(5)(B), which would lead to a concomitant increase in the number of union trustees. Clearly, a rule with the potential for such ill effects on multiemployer joint trust funds would conflict with the realities of modern industrial bargaining practices. While concededly it is not determinative, it is often appropriate to refer to existing bargaining practices as an aid in determining whether a particular issue should be accorded the status of a mandatory subject of bargaining. In this connection, we note the following statement from Levin, ERISA and Labor Management Benefit Funds, supra at 33-34:
 
 
 36
 "The next decade will see the diminution of single company joint funds and by the growth of multiemployer funds. . . . By the end of the decade, single employer funds may be a rarity, and the phrase 'Taft-Harley (sic) fund' may be almost synonymous with a multi-employer or industry-wide plan."
 
 
 37
 In our view, the widespread acceptance of multiemployer benefit and pension trust funds, established pursuant to Section 302(c)(5), is reflective of the fact that collective bargaining over such plans, including their subsidiary aspects such as the manner in which the trustees are selected, has been successful in accommodating the various interests of the parties. (Footnotes omitted.)
 
 
 38
 Sheet Metal Workers' International Ass'n Local 493, 97 L.R.R.M. 1476, 1484 (1978).
 
 
 39
 The other cases which have considered the question have agreed with the reasoning of Professor Goetz and the Sheet Metal case. See Associated Contractors of Essex County, Inc. v. Laborers International Union, 559 F.2d 222, 227 (3d Cir. 1977); Blassie v. Kroger Co., 345 F.2d 58, 72 (8th Cir. 1965); Mechanical Contractor Association of Washington v. Huico, Inc., 93 L.R.R.M. 2329 (W.D.Wash.1976); Local 169, International Brotherhood of Teamsters v. Teamsters Health and Welfare Fund, 327 F.Supp. 260 (E.D.Pa.1971).
 
 
 40
 The purpose of the statutory provision for equal employer-employee representation was to protect the interests of the employees from exploitation by unscrupulous union officials. See Arroyo v. United States, 359 U.S. 419, 425-426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959). There are obvious advantages to larger trusts which can take advantage of economies of scale in administrative costs and investments. Where building tradesmen, as here, move from job to job and employer to employer, it almost seems a necessity that industry or area-wide multiemployer trusts be permitted. So long as the employer trustees are truly independent of the domination of the unions, we perceive no reason why each contributing employer must be a direct participant in the trustee selection process if he is willing to contract away that right.
 
 
 41
 We see dangers that a strong union might pick a pliable employer group for the establishment of a fringe benefit trust, and try to force others to adopt and make payments to that trust. But if it appears that the unions (or employers) dominate the trustees, so there is not truly equal representation of employers and employees, then such cases as Quad City Builders Ass'n v. Tri City Bricklayers Union No. 7, 431 F.2d 999 (8th Cir. 1970) are relevant authority to upset such schemes. There is no contention in this case that the employer trustees are subservient to the unions.
 
 
 42
 The complaint here is that somehow the trust agreements impose an unreasonable burden upon the plaintiff associations. The duties and burdens of the trustees of all employee welfare plans under the Employee Retirement Income Security Act, are upon the individuals who serve. They must act solely in the interests of the plan participants, 29 U.S.C. § 1104(a), may not represent an interest adverse to the plan beneficiaries, Id. at § 1106(b)(2), and are personally liable in damages for breach of trust. Id. § 1109(a). The appointing authority is not responsible for the acts of the fiduciaries, unless upon some negligent selection theory. The briefs state, without contradiction, that all expenses (apparently except salary) are paid from the trusts, and that insurance protecting the trustees from personal liability has been procured and paid for from trust assets. The employer trustees are still employer representatives and there may still remain problems to be worked out reconciling trustee responsibilities under ERISA with Section 302 of the LMRA. But we do not see any substantial burden upon the associations here in any way inimical to the purposes of the law. If the associations think otherwise they can bargain collectively to impose limits in the next contract, so that only association members may contribute to these funds.
 
 
 43
 The decision of the trial court is affirmed for the reasons stated in this opinion.