Charles NEDD et al.

v.

UNITED MINE WORKERS OF AMERICA et al.

No. 8796–Civil.

United States District Court,
M. D. Pennsylvania.

July 25, 1980.

892

James Palermo, Hazleton, Pa., John R. McConnell, Philadelphia, Pa., for plaintiffs.

Thomas N. O'Neill, Jr., Philadelphia, Pa., James W. Scanlon, Scranton, Pa., Joseph A. Yablonski, Harrison Combs, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

## I. INTRODUCTION

This is a derivative action brought by pensioned coal miners on behalf of the Anthracite Health and Welfare Fund ("The Fund"). Plaintiffs claim that the United Mine Workers of America ("The Union") is responsible for the failure of the Fund's Trustees to collect tonnage royalties from anthracite coal mine operators accruing from June 7, 1946 to January 23, 1969. Specifically, liability is sought to be imposed on the Union for unpaid royalties, which plaintiffs claim approach $10,000,-000.00, because during the relevant period the Union, while occupying a dominant position on the Fund's Board of Trustees in violation of section 302(c)(5) of the Labor Management Relations Act of 1947,[1] pur-

---

1. Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186, provides in pertinent part:

    (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interests of an employer to pay, lend, or deliver or agree to pay, lend or deliver, any money or other thing of value—

    (1) to any representative of any of his employees who are employed in an industry affecting commerce; or

    (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

    (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

    (4) to any officer or employee of a labor organization engaged in any industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

    \*     \*     \*     \*     \*     \*

    (c) The provisions of this section shall not be applicable

    \*     \*     \*     \*     \*     \*

    (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive

sued a collection policy which would not have been followed by a reasonable man exercising common skill, prudence and caution, and which prima facie benefited working miners to the detriment of the retirees. Four distinct theories of liability have been asserted: (1) tortious interference with a collective bargaining agreement, a federal common-law action recognized under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185; (2) breach of the federal common-law duty of fair representation; (3) breach of fiduciary duties implied from § 302 of the Labor Management Relations Act, 29 U.S.C. § 186; and (4) violations of the Pennsylvania common-law of trusts. Authority to entertain this suit is predicated on 28 U.S.C. § 1331, 28 U.S.C. § 1337, and the doctrine of pendent jurisdiction.

In an opinion filed April 28, 1977, the Court of Appeals for the Third Circuit vacated this court's judgment in defendants' favor, concluding that (a) plaintiffs' federal causes of action are sufficient to support pendent jurisdiction; (b) the Union's liability under any of the theories advanced by plaintiffs requires no distinct factual find-ings; (c) plaintiffs have established that the Union *qua* trustee breached its duty of loyalty by pursuing a royalty collection policy that prima facie benefited working miners to the detriment of retired miners; (d) the Union's collection efforts, while in control of the Fund, were not performed with the degree of common skill, prudence, and caution required of a fiduciary; and (e) the burden is now on the Union to show what losses would have occurred in the absence of its breach of fiduciary obligations. *Nedd v. U.M.W.*, 556 F.2d 190 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978). The Court of Appeals accordingly remanded the case "for further proceedings in which the liability of the Union shall be redetermined by the application of the fiduciary standards of conduct and burden of proof set forth in this opinion." *Id.* at 214.

Presently before the court are the plaintiffs' and the Union's proposed findings of fact concerning the *scope* of the Union's *potential* liability.[2] Plaintiffs, relying primarily on the Fund's ledger cards (Exhibit "O"),[3] claim that unpaid delinquencies at-

benefit of the employees of such employer, and their families, and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments and their families and dependents); *Provided*, That (B) ... employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . . .

2. The proceedings to redetermine the Union's liability have been divided into three stages. *See* this court's Order dated June 9, 1978 (Doc. # 227). The first stage contemplates a determination of the extent of the Union's potential liability; the second stage involves ascertaining what losses would have occurred notwithstanding the Union's breach of fiduciary duties; and the final stage addresses the issue of whether the Union is entitled to setoffs for forgiven and unforgiven loans made to the Fund.

3. The Fund's ledger cards, Exhibit "O", are the monthly accounting records kept by the Fund's Trustees for each operator considered obligated to remit royalty payments. The ledger cards show the amount of tonnage reported by each operator to the Pennsylvania Department of Mines and to the Fund (when such reports were made to the Fund), along with payments of royalties made and the accrued balance due.

With respect to all but nine of the operators for which they make some claim, plaintiffs rely *exclusively* on the ledger cards. With respect to four of the nine remaining companies, Kohinoor Coal Co., Moosic Mountain Coal Co., Pioneer City Coal Co., and Steam Coals, Inc., plaintiffs point to the ledger cards and the Trustees' answers to interrogatories regarding lawsuits filed on behalf of the Fund against delinquent operators (Exhibit "L"). With respect to two of the five remaining operators, Diamond Coal Co. and Floss Coal Co., plaintiffs cite as evidence only Exhibit "L." With respect to Kehoe-Berge Coal Co., plaintiffs rely exclusively on Defendants' Exhibit 32, a chart prepared by Milton Lloyd, accountant for the Fund, indicating operator payments made with respect to asserted delinquencies. With respect to Penag Coal Co., plaintiffs refer to the ledger cards and a chart prepared by Milton Lloyd showing judgments against various operators, Lybrand audits, and operator reports to the Fund (Defendants' Exhibit 29). Finally, with respect to Lion Coal Co., plaintiffs cite the ledger cards, Defendants' Exhibit 29, and Trustees' Exhibit 11, an answer to plaintiffs' Interrogatory 17, listing lawsuits commenced by the

tributable to the Union's breach of fiduciary duties involve 86 separate operators and total $9,887,268.03.[4] The Union contends that the Fund's ledger cards are unreliable indicia of operator delinquencies, asserting that if Lybrand audits, operator reports to the Fund, and judgments obtained in lawsuits were used to compute the amounts due and owing, delinquencies for the companies listed by plaintiffs would total $5,499,811.24.[5] The Union also asserts that $1,912,863.57 of the principal sum claimed by plaintiffs accrued during periods when certain operators had not been signatories to a collective bargaining agreement creating the royalty obligations.[6] Since, argues the Union, § 302(c)(5)(B) prohibits payments to an employee pension fund unless "the detailed bases on which such payments are to be made is specified in a written agreement with the employer," 29 U.S.C. § 186(c)(5)(B), the sum of $1,912,863.57 was not legally "due and owing," and, therefore, is not recoverable in this action. Finally, the Union contends that $97,872.48 of the $1,093,976.30 claimed for Penag Coal Co. cannot be recouped because the Union no longer controlled the Fund when this sum accrued,[7] and that the Fund's ledger cards limit potential recovery for Hammond Coal Co. delinquencies to $473,627.85, rather than the $505,116.95 requested by plaintiffs.[8]

After careful consideration of the parties' proposed findings of fact and their supporting legal memoranda, I have concluded that (a) the ledger cards constitute competent proof of operator delinquencies; (b) arrearages accruing when certain operators were non-signatories to a collective bargaining agreement may be included as part of the Union's potential liability; (c) plaintiffs may claim as unpaid royalties for Hammond Coal Co. the sum of $505,116.95; and (d) the amount of $97,872.48 should be deducted from the figure claimed for Penag Coal Co. inasmuch as this sum represents delinquencies accruing after the Union relinquished its majority position on the

Trustees against delinquent operators. (Plaintiffs' Volume E, p.1 No. 5).

4. The Union has argued that plaintiffs must demonstrate a breach of trust for each royalty account that went uncollected. I have concluded, however, that such a requirement would be inconsistent with the Court of Appeals opinion, and that the matter presently before this court is not to ascertain whether the Union was guilty of culpable nonfeasance on a company-by-company basis, but to determine the extent of the Union's liability for pursuing a collection policy that would not have been followed by a reasonable man exercising common skill, prudence and caution, and which prima facie benefited working miners to the detriment of retirees. *Nedd v. U.M.W.*, 488 F.Supp. 1208, 1210–11 (M.D.Pa.,1980).

5. The Union cites in support of this contention defendants' Exhibit 29, a chart prepared by Milton Lloyd showing Lybrand audits, judgments against various operators, and operator reports to the Fund. Exhibit 29 indicates that as of June 30, 1974, twenty-one of the eighty-six operators listed by plaintiffs were in arrears for royalty payments totalling $5,386,893.69. The discrepancy between the figure in the text and the sum listed on defendants' Exhibit 29 is unexplained. Furthermore, the Union has not submitted proposed findings of fact for individual operator delinquencies based on the Lyb-

rand audits, operator reports to the Fund, and judgments obtained in lawsuits.

6. The figure in the text is derived by adding $1,366,066.45, the amount the Union claims should be subtracted from royalty delinquencies with respect to twenty-one operators who were non-signatories during all or part of the period when the arrearages accrued, and $506,-275.58 and $40,581.54, which represent the non-signatory portion of interest pertaining to delinquencies accruing for Diamond Coal Co. and Steam Coals, Inc., respectively, for whom plaintiffs' claim of principal liability includes $880,989.35 and $240,232.62 as the interest part of default judgments entered against the operators.

7. The Union alleges that the sum of $97,872.48 includes $81,176.20 in delinquencies attributable to the period following February, 1967, when the § 302 violation no longer existed, and $16,695.28, the portion of the interest included in the Trustees' stipulated judgment which pertained to the post-February, 1967 period.

8. The Union alleges that the Fund's ledger cards for Hammond Coal Co. show a balance due of $473,627.85, but also contain the unexplained notation "$505,116.95 per decree in Orphans' Court." Plaintiffs have claimed the larger sum.

Fund's Board of Trustees.[9] Accordingly, an order will be entered establishing the scope of the Union's potential liability as $9,789,-395.55.

## II. RELIANCE ON THE FUND'S LEDGER CARDS

It is the plaintiffs' burden at this stage of the remand proceedings to establish the extent of the Union's potential liability. Plaintiffs propose to discharge this burden with respect to seventy-seven of the eighty-six operators through the Fund's ledger cards, which list monthly tonnage reports submitted by the companies to the Fund pursuant to collective bargaining agreements negotiated between the Union and an employer association, referred to as the Anthracite Operators. The ledger cards also contain monthly production reports filed with the Pennsylvania Department of Mines.[10] In many instances, the operators, although filing tonnage reports with the Commonwealth, either failed to remit production reports to the Fund or submitted reports showing production lower than that which had been reported to the Pennsylvania Department of Mines. Where production reports were not submitted to the Fund, or where the reports submitted listed a smaller production than reported to the Commonwealth, the Fund's ledger cards indicate that the Department of Mines reports were used to calculate royalty delinquencies.

The Union contends that "[t]o the extent that the principal amounts stated by Plaintiffs are based solely on higher reports by certain operators to the Department [of Mines], Plaintiffs have failed to satisfy their burden of proving that the principal amounts recited by them were in fact due and owing."[11] *Defendants' Proposed Findings of Fact*, Doc. # 235 at 12. The Union asserts that the Department of Mines reports inflate the operators' delinquencies because (a) the amounts reported to the Department of Mines *may* have included production that was not anthracite "produced for use or for sale," for which royalties had to be paid;[12] (b) the amounts reported to the Department of Mines *may* have included production of certain grades of coal referred to as "fines," which purportedly did not constitute anthracite "produced for use or for sale";[13] and (c) some operators *may* have padded their Department of Mines reports in order to obtain a larger allocation under the Anthracite Production Control Plan. Citing Defendants' Exhibit 29, the Union contends that Lybrand audits, judgments obtained in lawsuits, and company reports to the Fund would establish total royalty delinquencies of $5,499,811.24, almost 4.4 million dollars less than the sum claimed by plaintiffs.[14]

9. The Union had also claimed that delinquencies of $4,082,103.83 accruing prior to January 1, 1959 were barred by the statute of limitations and/or the doctrine of laches. By Memorandum and Order dated April 1, 1980, the Union's contention was rejected. The April 1st Memorandum and Order also disallowed plaintiffs' claim of entitlement to pre-judgment interest. *See Nedd v. U.M.W.*, 488 F.Supp. 1208, (M.D.Pa., 1980).

10. The monthly production reports to the Department of Mines were required by legislation. Section 282 of the Pennsylvania Anthracite Coal Mine Act of 1965, P.L. 346, Pa.Stat.Ann. tit. 52, § 70–282 (1966) (Purdon), provides in pertinent part: "On or before the 15th day of every month, the operator or superintendent of every mine, bank, or colliery shall, with respect to the previous month, send . . . a report of the quantity of coal mined or produced and the man hours worked." The 1965 legislation replaced prior laws that also had required month-

ly reports. *See* Act of June 2, 1891, P.L. 176, § 3; Act of May 20, 1949, P.L. 1536, § 6, Pa.Stat.Ann. tit. 52, § 161 (repealed).

11. The Union does not identify on a company-by-company basis which operators' delinquencies were based on Department of Mines production reports, rather than reports to the Fund.

12. The Anthracite Wage Agreement of 1946, which created the Fund, provides that a royalty shall be paid "per ton on each ton of anthracite produced for use or for sale."

13. "Fines" are also described as "silt" in the deposition testimony of Charles A. Shea, Jr., special counsel to the Fund. Defendants' Exhibit 10, at pp. 178–179.

14. The Union's figure would also be subject to reduction for non-signatory operators, and the

Defendants' Exhibit 29 lists delinquencies as of June 30, 1974 for only 21 of the 86 operators named by plaintiffs. The 21 operators include 18 companies with respect to whom plaintiffs have utilized the Fund's ledger cards in support of claimed delinquencies.[15] The Union's position with respect to the other 65 operators for whom plaintiffs have cited the ledger cards is that this business record is totally unreliable, and, therefore, has no probative value whatsoever in demonstrating the extent of royalty delinquencies.

■ Application of the principles governing proof of damages compels rejection of the Union's argument. The prevailing Pennsylvania standards are recited in *Blackburn v. Aetna Freight Lines, Inc.*, 368 F.2d 345, 347-48 (3rd Cir. 1966):

> 'The law does not require that proof in support of claims for compensation must conform to the standard of mathematical exactness * * * If the facts afford a reasonably fair basis for calculating how much plaintiff is entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation.' *Smail v. Flock*, 407 Pa. 148, 154, 180 A.2d 59, 62. 'We have never held that the damages that are not capable of *exact ascertainment* are for that reason not recoverable .... Our law only requires that a reasonable quantity of information must be supplied by plaintiff so that the [fact-finder] may fairly estimate the amount of damages from the evidence.'

*Accord, Aiken Industries, Inc. v. Estate of Wilson*, 477 Pa. 34, 42, 383 A.2d 808 (1978); *Exton Drive-In, Inc. v. Home Indemnity Co.*, 436 Pa. 480, 488, 261 A.2d 319 (1969). This formulation would appear to be consistent with applicable federal standards. *See, e. g., Story Parchment Co. v. Patterson Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 1544 (1931); *Eazor Express, Inc. v. Teamsters*, 376 F.Supp. 841, 844, 848 (W.D.Pa.1974), *modified*, 520 F.2d 951 (3rd Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). In sum, as to the *extent* of damages rather than the actual existence of compensable injury plaintiffs need only adduce evidence that establishes a basis for the assessment of pecuniary loss with a fair degree of probability. *See Exton Drive-In Inc. v. Home Indemnity Co.*, 436 Pa. at 488, 261 A.2d 319. *See generally* C. McCormick, Handbook of the Law of Damages § 26 (1935).

■ The Fund's ledger cards constitute such evidence. The operators had an obvious incentive to under-report production to the Fund because royalties were based on reported production. Thus, it is reasonable to conclude that where reports to the Fund were substantially lower than the statutorily required reports to the Department of Mines, the latter reports more accurately reflected actual production. In addition, when no reports were submitted to the Fund, the reports filed with the Commonwealth could be treated as admissions of the operators' actual production.[16]

deductions listed for Hammond Coal Co. and Penag Coal Co. These deductions would show a net delinquency balance of $3,983,540.24, approximately six million dollars less than the sum claimed by plaintiffs.

15. Of the delinquencies shown for the 21 operators reported in defendants' Exhibit 29, 13 of the arrearages are less than the principal sum claimed by plaintiffs. (7 operators' arrearages are the same, and 1, Cunningham Coal Co., is roughly $350,000.00 more than the $2,796.50 requested by plaintiffs.) Although the Union would apparently argue that the smaller amounts for the 13 operators more accurately reflect actual delinquencies, the Union has not substantiated its position. Accordingly, the is-

sue of whether defendants' Exhibit 29 portrays the delinquencies of the 13 operators with more precision and certainty will not be considered here. The Union, if it wishes, may advance this argument in Stage II of the remand proceedings.

16. The onus would then have fallen on the operators to show that coal included in the Department of Mines filings was not coal for the purpose of royalty payments. In the matter *sub judice*, the Union has the burden of showing what part of the production reported to the Commonwealth cannot be counted for royalty purposes. The Union has not offered any evidence on this point.

Indeed, although the Union complains that the Department of Mines reports inflate operator delinquencies, it would appear that there would be an inclination to *understate* tonnage in these reports. During the period when delinquencies accrued the operators mined coal under an allocation formula that restricted production. As plaintiffs observe in their "*Response to the Union's Proposed Findings*," Doc. # 237 at 10, the tendency under such a system is to produce up to or beyond the allocation limits, and it appears that the operators had an obvious motive "to keep their reports of production to the Commonwealth low, so they would not be seen to have violated their allocated production level."[17] In any event, I believe that the Fund's ledger cards provide a basis upon which an assessment of damages may be made with a fair degree of probability.

Furthermore, the Union should not be heard to object to the accuracy of the fundamental record kept by the Trustees during the period when the Union "placed itself in the position of the Trustees for all practical purposes with respect to the enforcement of the royalty obligations of the mine operators." *Nedd v. U.M.W.*, 556 F.2d at 209. As the Supreme Court observed almost fifty years ago, "[t]he wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Patterson Co.*, 282 U.S. at 563, 51 S.Ct. at 250.[18]

Accordingly, the following list constitutes my findings on a company-by-company basis as to the scope of the Union's potential liability for 62 operators whose delinquencies are predicated on the Fund's ledger cards and with respect to whom the Union has raised no other objections.

| OPERATOR | DELINQUENCY |
| --- | --- |
| Appalachian Company | $ 500.00 |
| Beaver Brook Coal Company | 59,619.20 |
| Bittenbender Coal Company | 3,277.00 |
| Black Star Anthracite Co. | 15,458.58 |
| Briar City Coal Company | 1,436.50 |
| Broad Mountain Coal Co. | 5,090.00 |
| Capone Coal Company | 11,851.70 |
| Carbonizing Coal Co. | 23,457.20 |
| Centralia Mining Co. | 18,528.50 |
| Chestnut Hill Mining Co. | 39.72 |
| Chisnell Coal Company | 3,322.60 |
| Cicio Coal Company | 80.50 |
| C. & M. Coal Company | 1,458.00 |
| Coal Castle Fuels, Inc. | 164.50 |
| Colitz Coal Company | 6,669.00 |
| Conlon Coal Company | 32,459.35 |
| Connell Coal Company | 7,728.25 |
| Consagra Mining Company | 34,701.50 |
| Cunningham Coal Company | 2,796.50 |
| Dart Coal Company | 1,193.75 |
| Dial Rock Coal Company | 42,639.10 |
| Duryea Anthracite Company | 132,545.81 |
| Fisher Associates, Inc. | 106,503.10 |
| Fisher Coal Company | 47,915.30 |
| Gina Coal Company | 9,792.00 |
| Gold Star Coal Company | 1,063.40 |
| Hinkerman Coal Mining Co. | 14,592.70 |
| Holly Coal Company | 23,961.70 |
| Hydrotated Anthracite Fuels, Co., Inc. | 157,947.56 |
| Jackson Coal Company | 13,881.65 |
| Kehoe-Berge Coal Company | 319,988.30 |
| Kohinoor Coal Company | 19,417.40 |
| Lackawanna Mining Company | 1,523.00 |
| Lion Coal Company | 19,205.34 |
| Long Coal Company | 3,092.60 |
| M & M Anthracite Company | 1,812.00 |
| Meadowside Coal Company | 38,455.45 |
| Mineral Coal Company | 6,218.00 |
| Mineralis Recovery Corp. | 30,410.69 |
| Moosic Mountain Coal Co. | 54,912.44 |
| Morea Mining Company | 199,075.03 |
| Motley Coal Company | 30,445.53 |
| Mountaintop Coal Company | 109,227.45 |

---

17. Unlike the Union, which has not offered *any* evidence identifying the companies whose reports to the Department of Mines included production for which a royalty did not have to be paid, plaintiffs have submitted proof with respect to four operators, Newkirk Mining Co., Peca Coal Co., Penag Coal Co., and Steam Coals, Inc., stating the amounts by which reports to the Commonwealth understated actual production.

18. The Union has also contended that the judgments entered on behalf of the Fund in lawsuits prosecuted by the Trustees do not sustain plaintiffs' burden of proving that the judgment amounts were actually "due and owing." The judgments, however, constitute evidence as to what the Union dominated Trustees considered to be the operators' royalty delinquencies and thus form a reasonable basis for computing the extent of the Union's potential liability.

| OPERATOR | DELINQUENCY |
|---|---|
| Newkirk Mining Company | 360,606.10 |
| Otto Collieries Company | 109,179.50 |
| Panzitta Coal Company | 315.00 |
| Peca Coal Company, Inc. | 121,561.09 |
| Pioneer City Coal Co. | 70,302.45 |
| Progress Coal Company | 16,598.10 |
| Price Coal Company | 132,609.10 |
| Reilly Contracting Co. | 4,645.15 |
| Rhonda Coal Company | 47,842.85 |
| River Edge Processing Co. | 3,643.00 |
| Scutta Coal Company | 89,832.10 |
| Sheila Coal Corporation | 90,167.50 |
| The St. Clair Coal Company | 1,015,936.12 |
| Spring Brook Coal Company | 378.00 |
| Stevens Coal Company-Westwood Colliery | 33,517.50 |
| Tolerico Coal Company | 11,903.00 |
| Tunnel Ridge Coal Company | 109,802.50 |
| Valley View Coal Company | 19,303.96 |
| W. & W. Coal Sales | 28,923.30 |

In addition, I find that with respect to Floss Coal Company, whose delinquency is computed on the basis of Exhibit "L", and with respect to whom the Union has raised no other objections, $26,997.00 is the extent of the Union's possible liability.

## III. THE ALLEGED NON–SIGNATORY STATUS OF CERTAIN OPERATORS

■ The Union contends that $1,912,-863.57 of the principal sum claimed by plaintiffs accrued when 21 operators were not formal parties to the collective bargaining agreements creating an obligation to pay royalties.[19] Since pension fund payments made in the absence of a written agreement are illegal, see, e. g., *Walsh v. Schlecht*, 429 U.S. 401, 407, 97 S.Ct. 679, 684, 50 L.Ed.2d 641 (1977), the Union argues that plaintiffs cannot recover delinquencies accruing during non-signatory periods. Plaintiffs counter by pointing to evidence suggesting that the Union regarded the twenty-one operators as bound by the Agreement, asserting that the Fund's ledger cards, monthly notices of delinquent accounts (Vol. B, at 20, 126–27), reports sent by the District presidents to the Union showing the details of delinquencies (Vol. B, at 163, 169, 175, 176, 178, 182, 191, 266), and letters suggesting action in collecting royalties from signatory and non-signatory operators (e. g., letter of John L. Lewis to Messrs. Lippi, Brennan, and Kershetsky dated July 17, 1956, Vol. B, at 190), constitute evidence from which it may be inferred that the non-signatories were operating under the Anthracite Wage Agreement. Plaintiffs further assert that the companies' obligation to pay royalties is evidenced by payments made by some non-signatory operators,[20] and by the fact that some operators signed agreements with retroactive effective dates.[21]

19. The companies are: Coates Coal Company, Cyclone Coal Co., Diamond Coal Co., JAC Coal Co., Landingville Coal Co., Mary D. Mining Co., No. 9 Coal Co., Steam Coals, Inc., A & G Coal Co., Andershonis Coal Co., Concord Coal Co., Consolidated Mining Co., Dalebrook Coal Co., Dale Contracting Co., Dutch Gap Coal Co., Gentroy Coal Co., Hillside Coal Co., Locust Valley Coal Co., Parliament Coal Sales, Ryan, James V., Inc. and Skytop Coal Co. The Union contends that 8 of the 21 companies never signed an Anthracite Wage Agreement: A & G Coal Co., Hillside Coal Co., Locust Valley Coal Co., Parliament Coal Sales, Ryan, James V., Inc., Dale Contracting Co., Locust Valley Coal Co., and Concord Coal Co. Of the remaining 13 companies, the Union contends that plaintiffs have asserted claims for delinquencies accruing after Andershonis Coal Co. and Skytop Coal Co. ceased being signatories to the Anthracite Wage Agreement, and for delinquencies accruing before the other 11 operators signed the Anthracite Wage Agreement.

20. Plaintiffs have presented evidence suggesting that Diamond Coal Co., No. 9 Coal Co., Consolidated Mining Co., Dutch Gap Coal Co., Dalebrook Coal Co., and Skytop Coal Co. made royalty payments during periods when they were non-signatories to an Anthracite Wage Agreement. It should be noted, however, that these six companies were at one time or another signatories to the Anthracite Wage Agreement.

21. Plaintiffs contend that, by signing the 1952 Anthracite Wage Agreement, Consolidated Mining Co., Coates Coal Co., and Diamond Coal Co. were obligated to make royalty payments for tonnage produced between November 16, 1952, the Anthracite Wage Agreement's effective date, and the date on which the Agreements were signed. The Union, citing *Canaras v. Lift Truck Services*, 272 Md. 337, 322 A.2d 866 (1974), argues that these companies were legally obligated to make royalty payments only from the date of signing.

Were this an action against employers to enforce royalty obligations, the absence of a signed agreement detailing the bases upon which such payments were to be made would indeed make recovery of delinquencies problematic. The case law generally recognizes that in the absence of evidence indicating that the parties executed a written agreement within the intendment of section 302(c)(5)(B) an employer may not be compelled to pay, nor a trustee compelled to accept, trust fund payments. *See, e. g., Bricklayer's Union, Local 15 v. Stuart Plastering Co.,* 512 F.2d 1017, 1028–29 (5th Cir. 1975); *Local 529, United Brotherhood of Carpenters v. Bracey Development Co.,* 321 F.Supp. 869, 876 (W.D.Ark.1971). Furthermore, I do not believe that plaintiffs may establish assent by estoppel to the Anthracite Wage Agreements on the basis of pre-signatory payments to the Fund, inasmuch as "[t]he vast majority of courts ... have rejected the use of estoppel principles in cases of this sort." *Reiherzer v. Shannon,* 581 F.2d 1266, 1267 n.1 (7th Cir. 1978). *See, e. g., Moglia v. Geoghegan,* 403 F.2d 110, 118 (2d Cir. 1969), *cert. denied,* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969); *Phillips v. Kennedy,* 542 F.2d 52, 55 n.8 (8th Cir. 1976); *Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d 1106, 1108–09 (9th Cir. 1976).[22] Nor does it appear that estoppel principles could be used to enforce a royalty obligation against Skytop Coal Co., who continued making royalty payments for several years after its signatory status terminated. *Compare Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors v. Journeymen Plumbers, Local 31,* 586 F.2d 1367, 1373 (10th Cir. 1978) (payments made pursuant to a trust agreement fall within the section 302(c)(5)(B) written agreement requirement even though the collective bargaining con-

tract had expired). Finally, it is arguable that operators could not be legally bound to pay royalties on tonnage produced prior to signing the Anthracite Wage Agreement. *Cf. Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d at 1109 (retroactive payments to heal a break in coverage are illegal).

The prevailing case law also recognizes, however, that the absence of an enforceable obligation to contribute to an employee trust fund does not necessarily leave the employee remediless. For example, the Court of Appeals for the Second Circuit in *Moglia v. Geoghegan, supra,* while holding that a retiree was barred from receiving a pension because his employer had not been a signatory to a collective bargaining agreement or trust fund agreement with the employee's union, noted that its ruling

> does not preclude appellant from pursuing any other remedies that may be available to her.[3]
>
> [3] Our decision in this case does not preclude appellant from seeking further appropriate relief, such as turning over to her the payments already made on her husband's account by [the employer] to the Trustees. Possible grounds upon which recovery might be predicated such as, for instance, unjust enrichment or constructive trust, are still open to appellant.... Nor do we preclude the trustees from taking affirmative action to have the sums which [the employer] refused to take back paid over to appellant.

403 F.2d at 116 n.3 (citations omitted). *Accord, Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d at 1109 n.4. And in *Phillips v. Kennedy, supra,* the Court of Appeals for the Eighth Circuit, while rejecting an estoppel argument based, *inter alia,* on payments made to the trust fund, emphasized that "it is the duty of the trustees to verify on a regular basis the eligibility of those for whom contributions are being made. The breach of this duty

22. In *Doyle v. Shortman,* 311 F.Supp. 187 (S.D. N.Y.1970), the court held that non-union, non-signatory employers could lawfully contribute to welfare and pension plans inasmuch as they were members of the employers' association that negotiated the collective bargaining agreement containing the details of payments that were to be made, and the pension agreement provided for adoption by payment of contribu-

tions. There is no evidence in the instant matter indicating that any of the twenty-one companies were members of the Anthracite Operators, and the Anthracite Wage Agreements did not provide for adoption by remittance. It should also be noted that the *Doyle* court recognized that the non-signatory operators involved there could discontinue pension and welfare contributions at any time. *Id.* at 192.

might well expose the trustees to personal liability in an appropriate case." 542 F.2d at 55 n.8. Most recently, the Court of Appeals for the Ninth Circuit held that employee trust fund trustees could be sued in their individual capacities on a claim alleging breach of the "obligation to inform an applicant, and his contributing employer, of the applicant's ineligibility [for a pension] within a reasonable time after the trustee acquires knowledge of that ineligibility." *Aiken v. IP & GCU–Employer Retirement Fund*, 604 F.2d 1261, 1270 (9th Cir. 1979).[23]

■ If employee pension fund trustees have a duty to verify the eligibility of employees for whom contributions are being made, it would seem to follow that the trustees have a duty to take action that makes it possible to legally compel payments from those employers considered by the trustees to be subject to the trust fund agreement, and from non-signatory employers who are making otherwise "illegal" contributions.[24] This obligation is subsumed under the trustee's general duties "to take reasonable steps to take and keep control of the trust property," Restatement (Second) of Trusts § 175 (1959), "to use reasonable care and skill to preserve the trust property," *id.* at § 176, and "to take reasonable steps to realize on claims which he holds in trust." *Id.* at § 177. *See also Estate of*

*Stetson*, 463 Pa. 64, 82, 345 A.2d 679 (1975).[25] Furthermore, recognition of a duty to secure execution of requisite written agreements by parties whom the trustees reasonably believe should be participants appears essential where, as here, employees of non-signatories are ineligible for a pension.[26] Otherwise, union members unknowingly working for a nonsignatory employer who fails to make trust fund contributions would be left without a pension and a remedy.

Although the Trustees' records may not constitute admissions that the companies in question were in fact signatories, I believe that the evidence supports the finding that the Union *qua* trustee considered these operators to be "Union" companies who should have been paying royalties. Accordingly, the Union *qua* trustee had a duty to make the royalty obligations legally enforceable, and, therefore, the delinquencies accruing during periods of non-signatory status may be included in calculating the extent of the Union's liability.[27]

Moreover, traditional principles of the law of trusts indicate that the Union carries the burden of showing that the non-signatory delinquencies were indeed uncollectible. As Bogert notes,

23. The court also held that the trustees' interpretation of the retirement benefit plan, according to which the plaintiff was ineligible to participate because he was a sole proprietor, was reasonable, and that estoppel principles could not be utilized to compel payment of a pension.

24. It appears that six of the twenty-one operators made some payments to the Fund at a time when they were non-signatories. *See* note 20 *supra.*

25. As Bogert notes,
If the [trust] property consists of intangibles represented by documents like stock certificates, bonds, notes, mortgages, checks, drafts, bills of lading, warehouse receipts, and similar papers, he should get these instruments into his hands as soon as possible after the commencement of the trust in order to enable himself to prevent a possible destruction of his title by the application of the doctrine of negotiability, or the bona fide purchaser rule, or the recording acts.

G. Bogert, The Law of Trusts and Trustees § 583 (2d ed. 1960). Similarly, it would appear that a trustee is under a duty to take prudent action to ensure that trust fund claims are enforceable.

26. For cases holding that retired miners are ineligible for pensions because they worked for non-signatory operators see *Rittenberry v. Lewis*, 238 F.Supp. 506 (E.D.Tenn.1965); *Bolgar v. Lewis*, 238 F.Supp. 595 (W.D.Pa.1960).

27. I recognize that the proceedings have focused on collection efforts undertaken on behalf of the Fund and there has been no evidence concerning the extent of the Trustees' actions in securing the execution of a section 302(c)(5)(B) agreement. It would appear, however, that the burden of proof standards set forth in the Court of Appeals opinion, *Nedd v. U.M.W.* 556 F.2d at 211–12, require the Union to explain what efforts were taken to secure execution of written agreements and why such efforts were unsuccessful.

Naturally the trustee is not an insurer of the collectibility of claims held by the trust.... The trustee is held liable merely for the amount that an ordinarily prudent and skillful creditor would have been able to collect from the particular debtor, if he had proceeded with reasonable speed. *If a trustee claims that a debt due him was uncollectible, the burden is on him to prove the fact.*

G. Bogert, The Law of Trusts and Trustees § 592 (Rev.2d ed. 1978). In short, the Union has the burden of showing that the delinquencies were uncollectible because, for example, the companies remained non-signatories notwithstanding reasonable efforts to have them execute written agreements or for some other legally acceptable reason. This matter should be taken up in Stage II of the remand proceedings, and will not be addressed in determining the scope of the Union's potential liability. Accordingly, I find with respect to the alleged non-signatory operators the following sums to be the extent of the Union's possible liability.

| OPERATOR | DELINQUENCY |
|---|---|
| A & G Coal Company | $ 700.50 |
| Andershonis Coal Co. | 5,563.60 |
| Coates Coal Company | 154,042.80 |
| Concord Coal Company | 18,138.00 |
| Consolidated Mining Co. | 6,780.55 |
| Cyclone Coal Company | 139,137.83 |
| Dalebrook Coal Company | 5,522.40 |
| Dale Contracting Company | 7,450.30 |
| Diamond Coal Company | 1,983,661.00 |
| Dutch Gap Coal Company | 10,233.70 |
| Gentroy Coal Company | 9,589.50 |
| Hillside Coal Company | 39,335.30 |
| JAC Coal Company | 78,692.40 |
| Landingville Coal Co. | 20,127.90 |
| Locust Valley Coal Co. | 216,816.80 |
| Mary D. Mining Company | 63,894.84 |
| No. 9 Coal Company | 717,847.70 |
| Parliament Coal Sales | 2,110.50 |
| Ryan, James V., Inc. | 29,487.00 |
| Skytop Coal Company | 33,543.80 |
| Steam Coals, Inc. | 836,977.14 |

## IV. MISCELLANEOUS DEDUCTIONS

### A. *Hammond Coal Company*

Application of the principles discussed in the preceding two sections also compels rejection of the Union's contention that $31,489.10 should be deducted from plaintiffs' claim of $505,116.95. Plaintiffs' requested finding is based on the following notation on the Fund's ledger cards for Hammond: "$505,116.95 per figure in Orphans Court." Since the Hammond ledger cards were prepared when the Union dominated the Fund's Board of Trustees, the Union has the burden of showing that some lesser amount is due and owing. The Union has thus far failed to sustain this burden and, therefore, I find that $505,116.95 is the extent of the Union's potential liability for Hammond Coal Company delinquencies.

### B. *Penag Coal Company*

Plaintiffs have not contested the Union's assertion that $97,872.48 of the $1,093,976.30 claimed for Penag Coal Company accrued following February 1967, when the Union relinquished its dominant position on the Fund's Board of Trustees. *See Nedd v. U.M.W.*, Civil No. 8796, slip op. at 5–6 (M.D. Pa., April 13, 1976). Since the Union's liability is predicated on the section 302(c)(5) violation, *see Nedd v. U.M.W.*, 556 F.2d at 211, delinquencies post-dating the equal representation violation may not be included as part of the Union's potential liability. Accordingly, I find that the scope of the Union's liability with respect to Penag Coal Company is limited to $996,103.82.

## V. CONCLUSION

After examination of the evidence cited by the parties and upon careful consideration of the pertinent authorities, I conclude that only $97,872.48 should be excluded from plaintiffs' claimed potential liability of $9,887,268.03. Accordingly, I find the aggregate scope of the Union's potential liability to be $9,789,395.55.[28]

---

**28.** Included as part of plaintiff's claim of principal liability with respect to several operators is the interest portion of judgments entered against the operators. For example, the claim of $1,983,661.00 made in relation to Diamond

Coal Company includes $880,989.35 in interest. I have already held that plaintiffs are not entitled to pre-judgment interest. The question is whether the interest portion of judgments claimed by plaintiffs as part of the Union's

principal liability should also be disallowed. Neither party has addressed the matter, and therefore, consideration of the issue will be deferred to Stage II of the remand proceedings.